Fred **RENSING**, Plaintiff-Appellant,

v.

**INDIANA STATE UNIVERSITY BOARD OF TRUSTEES, Defendants-Appellees.**

No. 2–680A206.

Court of Appeals of Indiana, Fourth District.

June 16, 1982.

Rehearing Denied Aug. 4, 1982.

James L. Crawford, Sacopulos, Crawford & Johnson, Terre Haute, for plaintiff-appellant.

James E. Sullivan, Cox, Zwerner, Gambill & Sullivan, Terre Haute, for defendants-appellees.

MILLER, Presiding Judge.

Plaintiff-appellant, Fred W. Rensing, appeals the decision of the full Industrial Board of Indiana (Industrial Board) rejecting his claim for workmen's compensation from the defendant-appellee, the Indiana State University Board of Trustees (Trustees). Rensing, a varsity football player at Indiana State University—Terre Haute (University), was rendered a quadriplegic as a result of an injury occurring on April 24, 1976 during the team's spring football practice. At the time he was injured Rensing was receiving financial aid through a football scholarship awarded by the Trustees. On August 22, 1977 Rensing filed his claim seeking recovery for permanent total disability as well as medical and hospital expenses incurred due to the injury. Rensing's claim was rejected by the Industrial Board's Hearing Member on May 24, 1979, after which Rensing appealed to this Court challenging the Industrial Board's conclusion of law that an employer-employee relationship did not exist between Rensing and the Trustees and, therefore, he was not entitled to benefits under Indiana's Workmen's Compensation Act, Ind.Code 22–3–1–1 et seq.[1]

For the reasons stated below, we reverse the Industrial Board's decision and remand this cause to it for further proceedings consistent with this opinion.

1. Rensing presents other issues for our review—among them that the Board erred in permitting a law professor to testify regarding Rensing's contractual relationship with the University—which we need not consider because of our resolution of Rensing's principal contention.

## FACTS

The undisputed testimony reveals the Trustees, through their agent Thomas Harp (the University's Head Football Coach), on February 4, 1974 offered Rensing a scholarship or "educational grant" to play football at the University. In essence, the financial aid agreement,[2] which was renewable each year for a total of four years provided that in return for Rensing's active participation in football competition he would receive free tuition, room, board, laboratory fees, a book allowance, tutoring and a limited number of football tickets per game for family and friends. The "agreement" provided, *inter alia*, the aid would continue even if Rensing suffered an injury during supervised play which would make it inadvisable, in the opinion of the doctor-director of the student health service, "to continue to participate," although in that event the University would require other assistance to the extent of his ability.

The trustees extended this scholarship to Rensing for the 1974–75 academic year in the form of a "Tender of Financial Assistance.[3] Rensing accepted the Trustees' first

2. This agreement provided:
"INDIANA STATE UNIVERSITY Terre Haute, Indiana 47809 Department of Athletics

FINANCIAL AID AGREEMENT

Mr. Fred Rensing
Belleville, Illinois       Sport: FOOTBALL
This is to certify that Indiana State University will award you an educational grant if you meet the academic requirements of Indiana State University and the National Collegiate Athletic Association.
Your grant will consist of the following: Tuition Fees; Room and Board; and Book Allowance for a period of One Year.
This award may be renewed each year for a total of four years as long as you are academically qualified and abide by acceptable conduct standards.
In the event that you incur an injury, during supervised conduct of your sport, of such severity that the doctor-director of your student health service deems it inadvisable for you to continue to participate, this grant will be continued for as long as you are otherwise eligible for competition. In this instance, Indiana State University will ask you to assist in the conduct of the athletic program within the limits of your physical capabilities."

3. The first tender provided in relevant part:
"This is to advise you that the committee on student financial aid has awarded you an Athletic Grant-In-Aid as described below to continue your education at this institution. The award is made in accordance with the rules of this institution and the applicable provisions of the Constitution and Bylaws of the National Collegiate Athletic Association (NCAA). Your acceptance means that you also accept these provisions and agree to abide by them.
The benefits of the award are effective August 1974 to May 1975.
A summary of the applicable rules of the NCAA are set forth on the reverse side of this form. Please read carefully.
[reverse side]

1. In accepting this Tender of Financial Assistance, the recipient certifies:
(a) He is aware that any employment earnings during term time and any other financial assistance from any source other than that provided for in this award must be reported immediately to the Director of Athletics of the institution making the award.
(b) The aid provided in the Tender will be canceled if the recipient signs a professional sports contract or accepts money for playing in an athletic contest.
2. Financial aid may be awarded for any term or session during which the student-athlete is in attendance as a regularly enrolled undergraduate. The renewal of a scholarship or grant-in-aid award shall be made on or before July 1 prior to the academic year it is to be effective.
3. Maximum permissible financial aid may not exceed 'commonly accepted educational expenses'; i.e., tuition and fees, room and board, required course related supplies and books.
4. A student-athlete may not receive financial assistance other than that administered by the institution except that financial assistance may be received from anyone upon whom the student-athlete is naturally or legally dependent. (There is a special provision concerning financial aid awarded on bases having no relationship whatsoever to the recipient's athletic ability.)
5. When unearned financial aid is awarded to a student and athletic ability is taken into consideration in making the award, such aid combined with other aid the student-athlete may receive from employment during semester or term time, other scholarships and grants-in-aid (including governmental grants for educational purposes) and like sources, may not exceed commonly accepted educational expenses as defined in Paragraph 3 above. NCAA legislation permits limited exceptions to this requirement, most of which are related to military service benefits.

tender and signed it (as did his parents) on April 29, 1974. At the end of Rensing's first academic year the Trustees' extended a second "Tender of Financial Assistance"[4] for the 1975–76 academic year, which tender was substantially the same as the first and provided the same financial assistance to Rensing for his continued participation in the University's football program. Rensing and his father signed this second tender on June 24, 1975. It is not contested the monetary value of this assistance to Rensing for the 1975–76 academic year was $2,374, and that the "scholarship" was in effect when Rensing's injuries occurred.

According to Dr. Richard G. Landini, President of the University, it offered various grants to prospective students based on their respective athletic or scholastic talents. The basis for awarding an athletic scholarship was a recommendation by the University's Athletic Director (based upon the advice of the head coach and his assistants) made to Dr. Landini. In turn Dr. Landini forwarded the recommendations to the Trustees who then officially acted upon the recommendation. Dr. Landini empha-

sized that ultimate responsibility for awarding any scholarship rested with the Trustees. Significantly, Dr. Landini acknowledged that the University's increase in its student enrollment was attributable (to some degree) to the success of its athletic programs and that one justification for an athletic scholarship program was that such a program benefited the whole University.

Rensing testified he suffered a knee injury during his first year (1974–75) of competition which prevented him from actively participating in the football program, during which time he continued to receive his scholarship as well as free treatment for his knee injury. The only requirement imposed by the Trustees (through Coach Harp) upon Rensing was attendance at his classes and reporting daily to the football stadium for free whirlpool and ultrasonic treatments for his injured knee. Although the Trustees (through Coach Harp) did not require Rensing to assist the coaching staff in conducting the football program in order to fulfill his obligations under the financial assistance agreement (either after his knee inju-

Institutional aid MAY NOT BE GRADATED OR TERMINATED during the period of its award:
1. Because of the recipient's athletic ability or his contribution to a team's success.
2. Because an injury prevents the recipient from participating in athletics.
Institutional aid MAY BE GRADATED OR TERMINATED during the period of its award if the recipient:
1. Does not satisfy the stated institutional academic requirements for like scholarships or grants-in-aid.
2. Voluntarily renders himself ineligible for intercollegiate athletic competition.
3. Fraudulently misrepresents any information on his application, letter of intent or tender.
4. Engages in serious misconduct warranting substantial disciplinary penalty by the appropriate institutional committee or agency. (Serious misconduct means conduct of sufficient gravity that if comparable conduct occurred in other departments of the institution, similar substantial disciplinary penalty could properly be imposed. Serious misconduct includes manifest disobedience through violation of institutional regulations or established athletic department policies and rules applicable to all student-athletes.)

Such GRADATION OR TERMINATION of an award may occur if:
The action is taken by the institution's regular disciplinary and/or awards authority.
The student-athlete has had opportunity for a hearing.
The action is based on institutional policy applicable to the general student body."

4. The second "Tender of Financial Assistance" provided in relevant part:
"This is to advise you that the committee on student financial aid has awarded you an Athletic Grant-In-Aid as described below to continue your education at this institution. The award is made in accordance with the rules of this institution and the applicable provisions of the Constitution and ByLaws of the National Collegiate Athletic Association (NCAA). Your acceptance means that you also accept these provisions and agree to abide by them.
The benefits of the award are effective August, 1975 to May, 1976. They are: Tuition & Fees, Room & Board ($1,139.00), Book Allowance ($30.00 per semester).
A summary of the applicable rules of the NCAA are set forth on the reverse side of this form. Please read carefully. [Reverse side: same NCAA conditions as under First Tender. See n. 3, *supra*.]"

ry or the accident causing his quadriplegia), the uncontradicted evidence demonstrated Coach Harp *could have* required Rensing to assist the football coaches. As noted above, the financial aid agreement provided that in the event of an injury of such severity that it prevented continued athletic participation, "Indiana State University will ask you to assist in the conduct of the athletic program within the limits of your physical capabilities" in order to continue receiving aid. The sole assistance actually asked of Rensing was to *entertain prospective football recruits* when they visited the University's Terre Haute campus.

During the 1975 football season Rensing participated on the University's football team. In the spring of 1976 he partook in the team's annual three week spring practice when, on April 24, he was injured while he tackled a teammate during a punting drill. Coach Harp described the accident as follows:

"We were working on punt coverage and Fred was covering a punt. The ball was caught right at the time Fred arrived at that point, and in attempting to make the tackle, hit with his head the shoulder pad of the receiver, . . . . , and went under and sustained the injury."

Harp further described this particular play as a "severe tackle, it was one that you heard very seldom, it was heard all over the [football] stadium and [was] observed by the entire squad as a very hard tackle, [a] very hard hit."

The specific injury suffered by Rensing was a fractured dislocation of the cervical spine at the level of 4–5 vertebrae. Rensing's initial treatment consisted of traction and eventually a spinal fusion. During this period he developed pneumonia for which he had to have a tracheostomy. Eventually, Rensing was transferred to the Rehabilitation Department of the Barnes Hospital complex in St. Louis. According to Rensing's doctor at Barnes Hospital, one Franz U. Steinberg, Rensing's paralysis was caused by the April 24, 1976 football injury leaving him 95–100% disabled. The undisputed testimony revealed Rensing's ex-

penses for medical care and treatment totaled $120,449.26, some of which amount was paid by the University's insurer.

After reviewing the above evidence received at hearings on February 15 and 16, 1979, the Industrial Board's Hearing Member issued his findings and award as follow:

"BE IT REMEMBERED that pursuant to notice fixing the time and place therefor, the above-captioned cause was set for hearing before Mr. Richard J. Cronin, Member of the Industrial Board of Indiana, in the Civil Defense Meeting Room in the City Hall at Terre Haute, Vigo County, Indiana, on February 15 and February 16, 1979, at 9:00 o'clock a. m., on plaintiff's Form 9 Application for the Adjustment of Claim for Compensation, filed on the 22nd day of August, 1977. Plaintiff appeared in person and also appeared by his attorney, Mr. James L. Crawford, Terre Haute, Defendant appeared by its attorney, Mr. James E. Sullivan, Terre Haute, Indiana.

"COMES now the Plaintiff, by and through his attorney, Mr. James L. Crawford, and makes oral motion to amend Plaintiff's Form 9 Application as to the name of the Defendant from The State of Indiana, Indiana State University, The Board of Trustees of Indiana State University to Indiana State University Board of Trustees and to dismiss Plaintiff's Form 9 Application as to the other named Defendants, leaving the only Defendant in this cause as Indiana State University Board of Trustees, to which oral motion to amend Counsel for Defendant has no objection and the Hearing Member now finds that said oral motion should be and the same is hereby granted.

Said Hearing Member, having heard the oral stipulation by the parties of part of the facts in said cause, having heard the evidence, having read the medical deposition of Dr. Franz U. Steinberg, taken on behalf of Plaintiff, filed with Industrial Board of Indiana on September 14, 1978, and having examined the entire file in said cause and being duly advised in the premises therein, now finds:

"That on the 24th day of April, 1976, the Plaintiff herein sustained personal injury by reason of an accident arising out of and in the course of his participating as a football player for the Defendant in a Spring football practice scrimmage; that Plaintiff's said accidental injury consisted of a fracture dislocation of the cervical spine at the 4–5 vertebrae, resulting in a permanent total disability to Plaintiff's body as a whole.

It is further found that on April 24, 1976 at the time of Plaintiff's said accidental injury, Plaintiff was not in the employ of the Defendant herein; that the relationship of employer-employee within the meaning of the Indiana Workmen's Compensation Act [IC 22–3–1–1 et seq.] is contractual in character; that the relationship of the employer-employee always arises out of a contract, either express or implied; that one seeking recovery under the Act must bring themselves within its terms; that recovery of compensation depends upon the existence of the relation of the employer and employee; that the burden of proving by competent evidence of probative value the various essential elements of the Plaintiff's case before the Industrial Board of Indiana, including the establishment of the relationship of the employer and employee within the meaning of the Indiana Workmen's Compensation Act, rests solely upon the employee; that the Plaintiff failed to sustain his burden in establishing the necessary relationship of employer and employee within the meaning of the Indiana Workmen's Compensation Act.

It is further found that the undersigned Hearing Member has indulged in a measure of liberality in construing the legislative definition of 'employee' however, the Plaintiff has failed to bring himself within the terms of one seeking recovery under the Indiana Workmen's Compensation Act.

It is further found that prior to the filing of Plaintiff's application, a good faith effort was made by the parties to adjust said claim, which effort resulted in a disagreement between the parties and Plaintiff then filed his Form 9 Application on August 22, 1977.

Said Hearing Member now finds for the Defendant and against the Plaintiff on Plaintiff's Form 9 Application for the Adjustment of Claim for Compensation, filed on the 22nd day of August, 1977.

### AWARD

IT IS, THEREFORE, CONSIDERED, ORDERED AND ADJUDGED by the Industrial Board of Indiana that the Plaintiff shall take nothing by his Form 9 Application for the Adjustment of Claim for Compensation, filed on the 22nd day of August, 1977.

Dated this 24th day of May, 1979."

Rensing appealed to the full Industrial Board which on June 6, 1980 adopted in full the Hearing Member's above findings and award.

Based on the above facts Rensing appeals to this Court raising the previously stated issues.

### DISCUSSION AND DECISION

The Trustees concede some manner of contract existed between them and Rensing. However, the Trustees argue, and the Industrial Board concluded, there was no contract for hire or employment within the meaning of the Workmen's Compensation Act. Conversely, Rensing appeals from this conclusion, arguing that his agreement to play football (or, if he were injured, to otherwise help the football program in return for financial assistance) was a contract within the Act. We agree with Rensing.

■ Since Rensing is appealing from a negative award entered by the Industrial Board, the proper scope of review for this Court allows a reversal only if it appears that the Industrial Board's decision was erroneous as a matter of law. This requires Rensing to show that the evidence before the Industrial Board was without conflict and so conclusive in nature and character as to lead to only one conclusion in the minds of reasonable people but that the Industrial

Board reached a contrary conclusion. *See L. W. Edison, Inc. v. Teagarden,* (1981) Ind. App., 423 N.E.2d 709; *Penn-Dixie Steel Corp. v. Savage,* (1979) Ind.App., 390 N.E.2d 203; *Pike Cty. Hwy. v. Fowler,* (1979) Ind. App., 388 N.E.2d 630; *Anton v. Anton Interiors, Inc.,* (1977) 173 Ind.App. 419, 363 N.E.2d 1286. Such a negative award may be sustained on appeal by an absence of evidence favorable to the claimant's contentions or by the presence of evidence adverse to the claimant's contentions. *Duncan v. George Moser Leather Co.,* (1980) Ind.App., 408 N.E.2d 1332. On appeal from a negative award by the Industrial Board under an assignment that such an award is contrary to law, this Court is required to consider only that evidence most favorable to the Trustees. *Hendrickson v. Contracting & Material Co.,* (1966) 138 Ind.App. 193, 212 N.E.2d 903. In considering such evidence, this Court cannot weigh the evidence nor determine the credibility of witnesses before the Industrial Board. *Callahan v. Lovelace Truck Service,* (1973) 158 Ind.App. 164, 301 N.E.2d 801.

■ While Rensing, as the claimant appealing a negative award, has the burden to prove his right to compensation, *Burton v. General Motors Corp.* (1977), 172 Ind.App. 263, 360 N.E.2d 36, we note that our Workmen's Compensation statute is to be interpreted liberally. *Prater v. Indiana Briquetting Corp.,* (1969) 253 Ind. 83, 251 N.E.2d 810. Consequently, in applying the statutory definition of "employee" to particular fact situations, *a measure of liberality* should be indulged in by this Court to the end that *in doubtful cases* an injured workman or his dependents will not be deprived of the benefits of the humane provisions of our workmen's compensation law. *Schraner v. State Department of Corrections,* (1963) 135 Ind.App. 504, 189 N.E.2d 119.

Our determination that the requisite employer-employee relationship existed between Rensing and the Trustees, initially focuses on the definitions of "employer" and "employee" found in the Workmen's

Compensation Act.[5] In this regard, IC 22–3–6–1(a) defines "employer" to include:

"the state and any political division, any municipal corporation within the state, any individual, firm, association or corporation or the receiver or trustee of the same, or the legal representatives of a deceased person, using the services of another for pay. If the employer is insured it shall include his insurer so far as applicable."

"Employee" is defined at Ind.Code 22–3–6–1(b) as encompassing "every person, including a minor, in the service of another, under any contract of hire or apprenticeship, *written or implied,* except one whose employment is both casual and not in the usual course of the trade, business, occupation or profession of the employer." (Emphasis added.) By express exclusion, the Act's coverage does not apply to railroad employees or certain employees of municipal corporations, IC 22–3–2–2, nor does it apply to casual laborers, farm or agricultural employees, domestic servants, or the employers of such persons. IC 22–3–2–9.

■ In applying our Workmen's Compensation Act it is assumed that the Legislature's exclusion from the Act of certain employees indicates the Legislature's intent to include all other employees under the doctrine of *"expressio unius est exclusio alterius"* (the enumeration of certain things in a statute implies the exclusion of all other things). *Highland Sales Corp. v. Vance,* (1962) 214 Ind. 20, 186 N.E.2d 682; *Nash Engineering Co. v. Marcy Realty Corp.,* (1954) 222 Ind. 396, 54 N.E.2d 263. This fundamental principle of statutory analysis has been specifically applied to the Workmen's Compensation Act. *See In re Boyer,* (1917) 65 Ind.App. 408, 410, 117 N.E. 507, 508.

Thus, in the instant case the central question is not whether our Legislature has specifically excluded college sports participants from the coverage of the Act, since it is apparent the Legislature has not expressed such an intention, but rather

5. Although the Act was amended subsequent to the occurrence of Rensing's injury, none of these modifications are pertinent to our discussion here.

whether there was a "written or implied" employment contract within the meaning of the Act which obligated Rensing to play football in return for the scholarship he received. IC 22–3–6–1(b), *supra*.

■ Viewing the facts adduced in the case at bar, the conclusion is inescapable the Trustees did contract with Rensing to play football, regardless of whether one views the various documents submitted to Rensing and signed by him as constituting an *express* contract, or merely as evidence of the parties' understanding in support of an *implied* contractual relationship. In this regard, we note the settled law that "[a]ny benefit, commonly the subject of pecuniary compensation, which one, not intending it as a gift, confers on another, who accepts it, is adequate foundation for a legally implied or created promise to render back its value." 6 I.L.E. *Contracts* § 6 at 73 (1958), citing cases. The parties' financial aid "agreement," noted above, clearly anticipated not only that Rensing would play football in return for his scholarship, but also provided that in the event Rensing suffered an injury during supervised play that would make him "unable to continue to participate" in the opinion of the *University* doctor, the Trustees would ask him to assist in other tasks to the extent of his ability. The benefits would continue so long as Rensing was "otherwise eligible to compete." In light of such uncontradicted evidence, we can find no merit in the Trustees' suggestion Rensing's benefits were only a gift or "grant" intended to further the young man's education, particularly in light of the fact our Legislature has expressly recognized that scholarships or similar benefits may be viewed as pay pursuant to a "contract of hire" in the analogous context of unemployment benefits. *See* Ind.Code 22–4–6–2 which provides:

"For the purpose of determining the liability of an employing unit for the payment of contributions and the number of individuals performing services for remuneration, or under any contract of hire, *there shall be included all individuals attending an established school, college, university, hospital or training course, who, in lieu of remuneration for such services, receive either meals, lodging, books, tuition or other education facilities.*" (Emphasis added.)

Additionally, the Trustees also retained their right to terminate their agreement for Rensing's services under certain prescribed conditions, a factor tending to distinguish his grant from an outright gift and which has previously been noted by this Court as a significant indicia of an employer-employee or master-servant relationship. *E.g., Gibbs v. Miller*, (1972) 152 Ind.App. 326, 283 N.E.2d 592; *Long v. Sims Motor Transport Lines*, (1954) 124 Ind.App. 504, 117 N.E.2d 276. Each of the tender offers specified as part of the bargained-for exchange that the University could reduce or terminate Rensing's award if he:

1) failed to satisfy the University's and the NCAA's academic requirements for scholarships or grants-in-aid;

2) *voluntarily rendered himself ineligible for inter-collegiate competition*;

3) *fraudulently misrepresented any information on his application, letter of intent or tender*; or

4) engaged in serious misconduct warranting substantial disciplinary penalty by the appropriate University committee or agency.[6]

In this regard, we find especially significant the fact that Rensing's scholarship could be terminated if he misrepresented his intention to enroll (and by implication, play football) at the University. A football "letter of intent" signed by Rensing on March 6, 1974 required him to certify his intention to enroll at the University and further specified that if he elected to attend various other participating institutions, his athletic

---

6. According to the scholarship form, serious misconduct meant: "Conduct of sufficient gravity that if comparable conduct occurred in other departments of the institution, similarly substantial disciplinary penalty could properly be imposed. Serious misconduct includes manifest disobedience through violation of institutional regulations or established athletic department policy of rules applicable to all student-athletes."

eligibility at the institution of his choice could be restricted.

From these facts, the conclusion is compelling that Rensing and the Trustees bargained for an exchange in the manner of employer and employee of Rensing's football talents for certain scholarship benefits.[7] Admittedly, the issue we resolve herein is novel to Indiana. In fact, our research of the appropriate law throughout the country reveals only three cases which are particularly relevant. In *Van Horn v. Industrial Accident Commission*, (1963) 219 Cal.App.2d 457, 33 Cal.Rptr. 169, the California Court of Appeals held that the widow and minor children of a college football team member, who was killed in a plane crash while returning with squad members from a game, were entitled to his death benefits since he had received an athletic scholarship plus a job and, therefore, was rendering services within the meaning of the California Workmen's Compensation Act. The sole question before the Court was whether the decedent was an employee of the college within the meaning of the California's Workmen's Compensation Act so as to render the college liable thereunder for the death benefits to his dependents. In ruling affirmatively for the widow and her children the Court noted that "[t]he only inference to be drawn from the evidence is that the decedent received the 'scholarship' because of his athletic prowess and participation. The form of remuneration is immaterial. A court will look through form to determine whether consideration has been paid for services." (Citations omitted). *Id.* at 466, 33 Cal.Rptr. at 174.

The Court also emphasized the public policy of California behind its Workmen's Compensation Act as follows:

"The opinion of the commission sets forth the proposition that to conclude that one who has an athletic scholarship is an employee entitled to workmen's compensation benefits would impose a heavy burden on institutions of learning, would discourage the granting of scholarships, and, therefore, would be against public policy. We find no authority to the effect that an award in the present instance would be against public policy. On the contrary, the public policy of the State is declared in the Workmen's Compensation Act. (*Rideaux v. Torgrimson*, 12 Cal.2d 633, 86 P.2d 826.) All provisions of the workmen's compensation law should be liberally construed to effect the law's beneficient purposes. (*Colonial Ins. Co. v. Ind. Acc. Com.*, 27 Cal.2d 437, 439, 164 P.2d 490.) The theory of the compensation act as to death cases is that the dependents of the employee killed through some hazard of his employment shall be compensated for the loss of the support they were receiving from him at the time of his death. (*Spreckels Co. v. Industrial Acc. Com.*, 186 Cal. 256, 199 P. 8.)...."

The Workmen's Compensation Act is, in effect, a socially-enforced bargain which compels an employee to give up his valuable right to sue in the courts for full recovery of damages under common-law-theories in return for a certain, but limited, award. It compels the employer to give up his right to assert common-law defenses in return for assurance that the amount of recovery by the employee will be limited. In the evolution of workmen's compensation legislation and case law there has been an increasing recognition of its purpose to distribute the risk

7. We can attach no significance in reaching this conclusion to the Trustees' suggestion that one cannot be *both* a student and employee of an educational institution. The trustees cite, in support of their argument on appeal that no employment relationship existed, the following colloquy which occurred at trial:

"Q. Fred, when you first applied at Indiana State University, was it your intention to apply for a scholarship, or was it your intention to apply for employment?

A. I just wanted to play ball, I don't know how to answer that exactly. I signed to play football and to go to school here.

.    .    .

Q. Did you ever consider yourself at any time during your athletic career as being hired to play football *as opposed to going to school as a student*?

A. No, I always wanted to play ball on my own." (Emphasis added.)

of service-connected injuries or death by charging all enterprises with the costs and not merely those enterprises which produce salable products and which can therefore transfer the cost of injuries to the consumers of products. Thus, churches, charitable organizations, non-profit hospitals, universities and other large, publicly-supported institutions have been held to be employers within the meaning of the Workmen's Compensation Act."

*Id.* at 466–67, 33 Cal.Rptr. at 174.

The Colorado Supreme Court has addressed the issue considered herein on two separate occasions reaching different results (with the same analysis) on these occasions. In *State Compensation Insurance Fund v. Industrial Comm.*, (1957) 135 Colo. 570, 314 P.2d 288, a college student who had received an athletic scholarship for his tuition plus a part-time job was fatally injured while playing in a college football game. The Colorado Supreme Court denied his beneficiaries' claims for death benefits under the Colorado Workmen's Compensation Act holding that the evidence failed to establish that at the time of injury he was under a contract of hire to play football. Rather, his scholarship and part-time job were *not* based upon his athletic ability or participation on the football team. Lacking such a contract, the Colorado Supreme Court held there was no basis for a compensation claim. "Since the evidence does not disclose any contractual obligation to play football, then the employer-employee relationship does not exist and there is no contract which supports a claim for compensation under the [Colorado Workmen's Compensation Act.]" *Id.* at 572, 314 P.2d at 293.

The Colorado Supreme Court used the same analysis to find in favor of the student-athlete in *University of Denver v. Nemeth*, (1953) 127 Colo. 385, 257 P.2d 423. In *Nemeth*, the Court held a college student could be compensated under Colorado's Workmen's Compensation Act for injuries sustained during the spring football practice because in that case the student's employment by the University of Denver as

the manager of its tennis courts was contingent upon his participation on the football team. In reaching this result, the Court emphasized that a contract existed requiring the University of Denver to employ Nemeth as long as he was on the football team and further noted the testimony of one witness who stated that "the man who produced in football would get the meals and a job." *Id.* at 390, 257 P.2d at 426. Since Nemeth's employment by the University was dependent on his playing football and he could not retain his job without playing football, the Court held Nemeth was an employee of the University. Thus, his injury during spring practice was an incident of his employment, and therefore, was compensible under the Colorado Workmen's Compensation Act.

While the facts of *Van Horn* and *Nemeth* are distinguishable from the case at bar to the degree that Rensing did *not* receive a non-athletic job in return for his football prowess, we feel such a distinction is not significant in view of the language of our statute discussed *supra*. The evidence presented in those two cases is comparable to that introduced before the Industrial Board in the case at bar in that in all three cases the "student-athlete" received benefits from a university *solely* because of his athletic ability and participation on a football team. If that ability declined and he did not make the team or if he quit the team for some other reason, the benefits he received would be terminated. As noted above, the evidence in the case at bar clearly demonstrates that the benefits received by Rensing were conditioned upon his athletic ability and team participation. Consequently, the scholarship constituted a contract for hire within IC 22–3–6–1(b) and created an employer-employee relationship between the Trustees and Rensing.

█ Having decided that Rensing was an "employee" for pay within the meaning of IC 22–3–6–1(b), *supra*, this Court must now determine whether his employment by the Trustees was "casual and not in the usual course of the trade, business, occupation or profession of the employer" so as to bring it

outside the coverage of that statute. *Id.* We conclude that it was not.

At the outset we note that once Rensing carried his burden of proving the existence of a contract for hire creating the requisite employer-employee relationship, the Trustees were saddled with the burden of proving Rensing's employment was casual *and* not in the usual course of the Trustees' trade, business, occupation or profession. *E.g., Scott v. Rhoads,* (1943) 114 Ind.App. 150, 51 N.E.2d 89 (decedent hired by his father to do temporary work at an oil well site was an employee under the Act with respect to the owner of the well, since the decedent's father had authority to hire employees when needed, and the decedent's work, even if "casual," was in the usual course of the employer's business); *Kunkler v. Mauck,* (1940) 108 Ind.App. 98, 27 N.E.2d 97 (worker hired to repair rental properties fell within coverage of the Act since his employment, though casual, was in the usual course of business of the owner of the rental properties.) *See also Sandburn v. Hall,* (1951) 121 Ind.App. 428, 96 N.E.2d 912; *Crane v. Pangere & Logan,* (1950) 121 Ind.App. 97, 95 N.E.2d 216.

In the absence of a provision in our workmen's compensation act defining "casual employment," the usual and ordinary definition of the word "casual" as given by the lexicographers controls. *Sandburn v. Hall, supra. Webster's New Collegiate Dictionary,* (1976) defines "casual" at p. 173 as meaning: "Subject to, resulting from, or occurring by chance ... occupying without regularity: OCCASIONAL ... employed for irregular periods ...." However, the focus of this definition was altered by this Court in *Crabill v. Livengood,* (1967) 142 Ind.App. 627, 231 N.E.2d 854, where we defined "casual work" as being work which is "not permanent nor periodically regular, but occasional and not in the usual course of the employer's trade or business; the kind of work done and not the duration of the service is the determining factor." *Id.* at 629, 231 N.E.2d at 855; *accord; Board of Commissioners of Allen County v. Goble,* (1944) 115 Ind.App. 102, 57 N.E.2d 69 (individual hired by county election board to prepare voting machines was a covered employee under the Act); *Scott v. Rhoads, supra; Coffin v. Hook,* (1942) 112 Ind.App. 549, 45 N.E.2d 369 (worker hired to repair roof of farm residence was engaged in casual employment not in the usual course of the trade, business, occupation or profession of his employer); *Kunkler v. Mauck, supra; Mason v. Wampler,* (1929) 89 Ind.App. 483, 166 N.E. 885 (worker hired to remodel a dwelling was engaged in casual labor which was not in the usual course of the owner's business, trade, occupation or profession).

In defining "casual" employment, the infrequency of employment or its duration is immaterial; in each case, the analysis is concerned with the service rendered or the work done, rather than with the casual nature of the employment contract. *Crabill v. Livengood, supra.* Moreover, our Courts have recognized there is no "hard and fast rule by which it can clearly and unfailingly be determined where to draw the line between employments which are casual and those which are not." *Lasch v. Corns,* (1950) 120 Ind.App. 31, 34, 89 N.E.2d 553, 555. Each case must rest, in the final analysis, upon its own facts and circumstances. *Id.*

Applying the above standard to the facts most favorable to the Trustees, it is apparent that Rensing's employment *was not* casual, since it clearly was "periodically regular," although not permanent. *Crabill v. Livengood, supra.* The uncontradicted evidence revealed that for the team members football is a daily routine for 16 weeks each year. Additionally, during the "off-season" the "student-athlete" must daily work out to maintain his physical skills and attributes, thereby enhancing his eligibility for the team which is the basis for his scholarship. The University fields a major college football team and participates in a major college conference, The Missouri Valley Conference. In addition, the Trustees employ a large athletic department to administer the University's intercollegiate athletic program (in addition to physical education classes) and a sizable football coaching staff whose primary responsibility is to produce

the best possible team so as to generate the largest possible income and whose teaching responsibilities to the general student body are, at best, of secondary importance. With regard to Rensing specifically, Coach Harp actively recruited him—his appearance at the University was not happenstance, liable to chance or an accident. In light of these facts Rensing's employment by the University was not "casual."

The second element of the exception stated at IC 22–3–6–1(b) which the Trustees were also required to prove was that Rensing's employment was *not* in the usual course of the Trustee's business, trade, occupation or profession. This has been defined as meaning "employment on any work in connection with and reasonably necessary to the employer's business." *Hoffner v. White*, (1943) 224 Ind. 315, 47 N.E.2d 964; *accord, Kunkler v. Mauck*, (1940) 108 Ind.App. 98, 27 N.E.2d 97; *J. P. O. Sandwich Shop v. Papadopoulos*, (1938) 105 Ind.App. 165, 13 N.E.2d 869; *Olsen v. Canter*, (1931) 93 Ind.App. 150, 176 N.E. 27; *Domer v. Castator*, (1925) 82 Ind.App. 574, 146 N.E. 881; *Wagner v. Wooley*, (1926) 85 Ind.App. 259, 152 N.E. 856. Significantly, our Courts have also recognized an employer may have more than one business, trade or profession, and that the Act's coverage is not limited to the employer's principal activities. Such a restrictive argument was advanced in *Scott v. Rhoads, supra* at 151, 51 N.E.2d at 91, where it was contended the principal occupation of an oil well owner was farming. To this the Appellate Court responded:

"It will be noted the provision of the Workmen's Compensation Act here under consideration does not provide that the employment must be in the usual course of the 'principal' trade, business, etc., of the employer, but only that the employment must be in the course of the trade, business, etc., of such employer. We are of the opinion that an employer may be engaged in various separate and independent kinds of businesses or occupations, and that his employees in the usual course of each of said businesses or occupations are entitled to the benefits of the Workmen's Compensation Act. Any other construction of the provision of the statute herein involved would tend to nullify the humane purposes which the Workmen's Compensation Act seeks to accomplish."

It is manifest from the record in the case at bar that maintaining a football team is an important aspect of the University's overall business or profession of educating students, even if it may not be said such athletic endeavors themselves are the University's "principal" occupation. Suffice it to say, it was uncontroverted that football specifically and athletes generally play a beneficial role in creating the desired educational environment at the University, as evidenced by increased enrollments over the last few years as the University has prospered athletically through nationally-recognized intercollegiate athletic teams. Although we need not reach the question because of our conclusion that Rensing's employment was not "casual," we believe football competition must properly be viewed as an aspect of the University's overall occupation.

While we hold Rensing is entitled to workmen's compensation benefits, we note that despite uncontradicted evidence on the amount of benefits he seeks, the Industrial Board failed to enter any findings or conclusions on this question. Consequently we must remand this cause to it for further proceedings to establish the benefits Rensing will receive.

Reversed and remanded.

SHIELDS, J. (sitting by designation), concurs.

YOUNG, J., dissents with opinion.

YOUNG, Judge, dissenting.

I dissent. I do not believe that students who participate in intercollegiate athletics while on scholarship are "employees" within the meaning of Indiana's Workmen's Compensation Act.

The only conclusion that can be drawn from the majority's opinion is that every

athletic scholarship constitutes a contract for hire and thus creates an employer-employee relationship between the athlete and the school. This is directly contrary to the holding in *Van Horn v. Industrial Accident Commission*, (1963) 219 Cal.App.2d 457, 33 Cal.Rptr. 169, which is relied upon by the majority. "It cannot be said as a matter of law that every student who receives an 'athletic scholarship' and plays on the school athletic team is an employee of the school." *Id.* at 467, 33 Cal.Rptr. at 175.

I agree that "a measure of liberality should be indulged in by this Court" in applying the statutory definition of employee. *Schraner v. State Department of Corrections*, (1963) 135 Ind.App. 504, 189 N.E.2d 119. However, the doctrine of liberal construction should not be used to extend the Workmen's Compensation Act to a situation which it was never designed to cover. I cannot believe that the legislature in defining employee ever intended to include a college student who had an athletic scholarship. "Employee" is defined as including "every person, including a minor, in the service of another, under any contract of hire or apprenticeship, written or implied, except one whose employment is both casual and not in the usual course of the trade, business, occupation or profession of the employer." Ind.Code 22–3–6–1(b). I agree with the majority that Rensing and the Trustees entered into a contract. I do not, however, believe that it was a "contract of hire." I agree with the holding in *State Compensation Insurance Fund v. Industrial Commission*, (1957) 135 Colo. 570, 314 P.2d 288, that an athletic scholarship without more does not constitute a contract for hire.

Furthermore, I do not believe that Rensing was "in the service of" the Trustees. Rensing's participation in football may well have benefited the university in a very general way. That does not mean that Rensing was in the service of the Trustees. If a student wins a Rhodes scholarship or if the debate team wins a national award that undoubtedly benefits the school, but does not mean that the student and the team are in the service of the school. Rensing performed no duties that would place him in the service of the university. *See State Compensation Insurance Fund, supra.*

I would affirm the decision of the Industrial Board.