Fred W. RENSING, Appellant,

v.

INDIANA STATE UNIVERSITY BOARD
OF TRUSTEES, Appellee.

No. 283S45.

Supreme Court of Indiana.

Feb. 9, 1983.

James L. Crawford, Sacopulos, Crawford
& Johnson, Terre Haute, for appellant.

James E. Sullivan, Cox, Zwerner, Gambill
& Sullivan, Terre Haute, for appellee.

HUNTER, Justice.

This case is before this Court upon the petition to transfer of defendant-appellee, Indiana State University Board of Trustees (Trustees). The plaintiff-appellant, Fred W. Rensing, was a varsity football player at Indiana State University who suffered an injury on April 24, 1976, during the team's spring football practice which left him a quadriplegic. Rensing filed a claim with the Industrial Board of Indiana (Industrial Board) seeking recovery under workmen's

compensation for permanent total disability as well as medical and hospital expenses incurred due to the injury. The Industrial Board rejected his claim finding that an employer-employee relationship did not exist between Rensing and the Trustees and, therefore, he was not entitled to benefits under the Workmen's Compensation Act, Ind.Code § 22–3–1–1 *et seq.* (Burns 1974). The Court of Appeals, Fourth District, reversed the decision of the Industrial Board on the basis that Rensing was an "employee" for pay within the meaning of the statute and his employment by the Trustees was also within the coverage of the statute. *Rensing v. Indiana State University Board of Trustees,* (1982) Ind.App., 437 N.E.2d 78 (Young, J., dissenting).

We now grant transfer and reverse. The opinion and decision of the Court of Appeals are hereby vacated, and plaintiff's petition to transfer is granted. The decision of the Full Industrial Board is reinstated.

The facts established before the Industrial Board were summarized by the Court of Appeals:

> "The undisputed testimony reveals the Trustees, through their agent Thomas Harp (the University's Head Football Coach), on February 4, 1974 offered Rensing a scholarship or 'educational grant' to play football at the University. In essence, the financial aid agreement, which was renewable each year for a total of four years provided that in return for Rensing's active participation in football competition he would receive free tuition, room, board, laboratory fees, a book allowance, tutoring and a limited number of football tickets per game for family and friends. The 'agreement' provided, *inter alia,* the aid would continue even if Rensing suffered an injury during supervised play which would make it inadvisable, in the opinion of the doctor-director of the student health service, 'to continue to participate,' although in that event the University would require other assistance to the extent of his ability.

> "The trustees extended this scholarship to Rensing for the 1974–75 academic year in the form of a 'Tender of Financial Assistance.' Rensing accepted the Trustees' first tender and signed it (as did his parents) on April 29, 1974. At the end of Rensing's first academic year the Trustees extended a second 'Tender of Financial Assistance' for the 1975–76 academic year, which tender was substantially the same as the first and provided the same financial assistance to Rensing for his continued participation in the University's football program. Rensing and his father signed this second tender on June 24, 1975. It is not contested the monetary value of this assistance to Rensing for the 1975–76 academic year was $2,374, and that the 'scholarship' was in effect when Rensing's injuries occurred.

> \*　　\*　　\*　　\*　　\*　　\*

> "Rensing testified he suffered a knee injury during his first year (1974–75) of competition which prevented him from actively participating in the football program, during which time he continued to receive his scholarship as well as free treatment for his knee injury. The only requirement imposed by the Trustees (through Coach Harp) upon Rensing was attendance at his classes and reporting daily to the football stadium for free whirlpool and ultrasonic treatments for his injured knee.

> \*　　\*　　\*　　\*　　\*　　\*

> "As noted above, the financial aid agreement provided that in the event of an injury of such severity that it prevented continued athletic participation, 'Indiana State University will ask you to assist in the conduct of the athletic program within the limits of your physical capabilities' in order to continue receiving aid. The sole assistance actually asked of Rensing was to entertain prospective football recruits when they visited the University's Terre Haute campus.

> "During the 1975 football season, Rensing participated on the University's football team. In the spring of 1976 he partook in the team's annual three week spring

practice when, on April 24, he was injured while he tackled a teammate during a punting drill.

\* \* \* \* \* \*

"The specific injury suffered by Rensing was a fractured dislocation of the cervical spine at the level of 4–5 vertebrae. Rensing's initial treatment consisted of traction and eventually a spinal fusion. During this period he developed pneumonia for which he had to have a tracheostomy. Eventually, Rensing was transferred to the Rehabilitation Department of the Barnes Hospital complex in St. Louis. According to Rensing's doctor at Barnes Hospital, one Franz U. Steinberg, Rensing's paralysis was caused by the April 24, 1976 football injury leaving him 95–100% disabled." *Rensing v. Indiana State University Board of Trustees, supra,* at pp. 80–82 (footnotes omitted).

Rensing's appeal to the Industrial Board was originally heard by a Hearing Member who found that Rensing had "failed to sustain his burden in establishing the necessary relationship of employer and employee within the meaning of the Indiana Workmen's Compensation Act," and rejected his claim. *Id.* at p. 83. The Full Industrial Board adopted the Hearing Member's findings and decision; then this decision was reversed by the Court of Appeals.

In this petition to transfer, the Trustees argue that there was no contract of hire in this case and that a student who accepts an athletic "grant-in-aid" from the University does not become an "employee" of the University within the definition of "employee" under the Workmen's Compensation Act, Ind.Code § 22–3–6–1(b), (Burns Supp.1982). On the other hand, Rensing maintains that his agreement to play football in return for financial assistance did amount to a contract of employment.

■ We first note that Rensing is appealing from a negative judgment. In our review of that judgment, we will not weigh the evidence nor judge the credibility of witnesses and, where there is a conflict in the evidence, this Court will only consider the evidence which tends to support the Board's award and which is most favorable to the appellee. We will not disturb the Board's finding unless the evidence is undisputed and leads inescapably to a contrary result. *Perez v. United States Steel Corp.,* (1981) Ind., 428 N.E.2d 212; *Penn-Dixie Steel Corp. v. Savage,* (1979) Ind.App., 390 N.E.2d 203; *Robinson v. Twigg Industries, Inc.,* (1972) 154 Ind.App. 339, 289 N.E.2d 733.

■ Here, the facts concerning the injury are undisputed. The contested issue is whether the requisite employer-employee relationship existed between Rensing and the Trustees so as to bring him under the coverage of our Workmen's Compensation Act. Both the Industrial Board and the Court of Appeals correctly noted that the workmen's compensation laws are to be liberally construed. *Prater v. Indiana Briquetting Corp.,* (1969) 253 Ind. 83, 251 N.E.2d 810. With this proposition as a starting point, the specific facts of this case must be analyzed to determine whether Rensing and the Trustees come within the definitions of "employee" and "employer" found in the statute, and specifically whether there did exist a contract of employment. Ind.Code § 22–3–6–1, *supra,* defines the terms "employee" and "employer" as follows:

"(a) 'Employer' includes the state and any political subdivision, any municipal corporation within the state, any individual, firm, association or corporation or the receiver or trustee of the same, or the legal representatives of a deceased person, using the services of another for pay."

"(b) The term 'employee' means every person, including a minor, in the service of another, under any contract of hire or apprenticeship, written or implied, except one whose employment is both casual and not in the usual course of the trade, business, occupation or profession of the employer."

The Court of Appeals found that there was enough evidence in the instant case to support a finding that a contract of employment did exist here. We disagree.

■ It is clear that while a determination of the existence of an employee-employer relationship is a complex matter involving many factors, the primary consideration is that there was an intent that a contract of employment, either express or implied, did exist. In other words, there must be a mutual belief that an employer-employee relationship did exist. *Fox v. Contract Beverage Packers, Inc.,* (1980) Ind.App., 398 N.E.2d 709, *Gibbs v. Miller,* (1972) 152 Ind. App. 326, 283 N.E.2d 592. It is evident from the documents which formed the agreement in this case that there was no intent to enter into an employee-employer relationship at the time the parties entered into the agreement.

■ In this case, the National Collegiate Athletic Association's (NCAA) constitution and bylaws were incorporated by reference into the agreements.[1] A fundamental policy of the NCAA, which is stated in its constitution, is that intercollegiate sports are viewed as part of the educational system and are clearly distinguished from the professional sports business. The NCAA has strict rules against "taking pay" for sports or sporting activities. Any student who does accept pay is ineligible for further play at an NCAA member school in the sport for which he takes pay. Furthermore, an institution cannot, in any way, condition financial aid on a student's ability as an athlete. NCAA Constitution, Sec. 3–1–(a)–(1); Sec. 3–1–(g)–(2). The fundamental concerns behind the policies of the NCAA are that intercollegiate athletics must be maintained as a part of the educational program and student-athletes are integral parts of the institution's student body. An athlete receiving financial aid is still first and foremost a student. All of these NCAA requirements designed to prohibit student-athletes from receiving pay for par-

ticipation in their sport were incorporated into the financial aid agreements Rensing and his parents signed.

Furthermore, there is evidence that the financial aid which Rensing received was not considered by the parties involved to be pay or income. Rensing was given free tuition, room, board, laboratory fees and a book allowance. These benefits were not considered to be "pay" by the University or by the NCAA since they did not affect Rensing's or the University's eligibility status under NCAA rules. Rensing did not consider the benefits as income as he did not report them for income tax purposes. The Internal Revenue Service has ruled that scholarship recipients are not taxed on their scholarship proceeds and there is no distinction made between athletic and academic scholarships. Rev.Rul. 77–263, 1977–31 I.R.B. 8.

As far as scholarships are concerned, we find that our Indiana General Assembly clearly has recognized a distinction between the power to award financial aid to students and the power to hire employees since the former power was specifically granted to the Boards of Trustees of state educational institutions with the specific limitation that the award be reasonably related to the educational purposes and objectives of the institution and in the best interests of the institution and the state. Ind.Code § 20–12–1–2(h) (Burns 1975).

■ Furthermore, we find that Ind.Code § 22–4–6–2 (Burns 1974) is not applicable to scholarship benefits. In that statute, which deals with contributions by employers to unemployment insurance, employers are directed to include "all individuals attending an established school ... who, in lieu of remuneration for such services, re-

---

1. Both the Tender of Financial Assistance signed by Rensing and his parents in 1974 and the one signed by Rensing and his father in 1975 contained the following paragraph:

"This is to advise you that the committee on student financial aid has awarded you an Athletic Grant-In-Aid as described below to continue your education at this institution. The award is made in accordance with the

rules of this institution and the applicable provisions of the Constitution and ByLaws of the National Collegiate Athletic Association (NCAA). Your acceptance means that you also accept these provisions and agree to abide by them."

The agreement also contained a summary of the applicable rules of the NCAA.

ceive either meals, lodging, books, tuition or other education facilities." Here, Rensing was not working at a regular job for the University. The scholarship benefits he received were not given him in lieu of pay for remuneration for his services in playing football any more than academic scholarship benefits were given to other students for their high scores on tests or class assignments. Rather, in both cases, the students received benefits based upon their past demonstrated ability in various areas to enable them to pursue opportunities for higher education as well as to further progress in their own fields of endeavor.

Scholarships are given to students in a wide range of artistic, academic and athletic areas. None of these recipients is covered under Ind.Code § 22–4–6–2, supra, unless the student holds a regular job for the institution in addition to the scholarship. The statute would apply to students who work for the University and perform services not integrally connected with the institution's educational program and for which, if the student were not available, the University would have to hire outsiders, e.g., workers in the laundry, bookstore, etc. Scholarship recipients are considered to be students seeking advanced educational opportunities and are not considered to be professional athletes, musicians or artists employed by the University for their skills in their respective areas.

In addition to finding that the University, the NCAA, the IRS and Rensing, himself, did not consider the scholarship benefits to be income, we also agree with Judge Young's conclusion that Rensing was not "in the service of" the University. As Judge Young stated:

> "Furthermore, I do not believe that Rensing was 'in the service of' the Trustees. Rensing's participation in football may well have benefited the university in a very general way. That does not mean that Rensing was in the service of the Trustees. If a student wins a Rhodes

scholarship or if the debate team wins a national award that undoubtedly benefits the school, but does not mean that the student and the team are in the service of the school. Rensing performed no duties that would place him in the service of the university." Rensing v. Indiana State University, supra, at 90.

Courts in other jurisdictions have generally found that such individuals as student athletes, student leaders in student government associations and student resident-hall assistants are not "employees" for purposes of workmen's compensation laws unless they are also employed in a university job in addition to receiving scholarship benefits. Marshall v. Regis Educational Corp., (10th Cir.1981) 666 F.2d 1324; Bobilin v. Board of Education, (D.Hawaii 1975) 403 F.Supp. 1095; Van Horn v. Industrial Accident Commission, (1963) 219 Cal.App.2d 457, 33 Cal.Rptr. 169; State Compensation Insurance Fund v. Industrial Commission, (1957) 135 Colo. 570, 314 P.2d 288.

All of the above facts show that in this case, Rensing did not receive "pay" for playing football at the University within the meaning of the Workmen's Compensation Act; therefore, an essential element of the employer-employee relationship was missing in addition to the lack of intent. Furthermore, under the applicable rules of the NCAA, Rensing's benefits could not be reduced or withdrawn because of his athletic ability or his contribution to the team's success. Thus, the ordinary employer's right to discharge on the basis of performance was also missing. While there was an agreement between Rensing and the Trustees which established certain obligations for both parties, the agreement was not a contract of employment. Since at least three important factors indicative of an employee-employer relationship are absent in this case, we find it is not necessary to consider other factors which may or may not be present.[2]

---

2. Seven factors are listed by Chief Judge Buchanan in Fox v. Contract Beverage Packers, Inc., supra, as being used to determine if an employer-employee relationship exists. Some

of these factors were found to be present in the instant case by the Court of Appeals, but others were not present, including the fundamentally important one of a "belief of the parties in

We find that the evidence here shows that Rensing enrolled at Indiana State University as a fulltime student seeking advanced educational opportunities. He was not considered to be a professional athlete who was being paid for his athletic ability. In fact, the benefits Rensing received were subject to strict regulations by the NCAA which were designed to protect his amateur status. Rensing held no other job with the University and therefore cannot be considered an "employee" of the University within the meaning of the Workmen's Compensation Act.

It is our conclusion of law, under the facts here, including all rules and regulations of the University and the NCAA governing student athletes, that the appellant shall be considered only as a student athlete and not as an employee within the meaning of the Workmen's Compensation Act. Accordingly, we find that there is substantial evidence to support the finding of the Industrial Board that there was no employee-employer relationship between Rensing and the Trustees, and their finding must be upheld.

For all of the foregoing reasons, transfer is granted; the opinion of the Court of Appeals is vacated and the Industrial Board is in all things affirmed.

The judgment and determination of the Industrial Board are affirmed.

GIVAN, C.J., and DeBRULER, PRENTICE and PIVARNIK, JJ., concur.

the existence of an employer-employee rela-       tionship." *Id.* at 711–712.