**Jearl E. GOODNIGHT, Appellant,**

v.

**ZURICH INSURANCE COMPANY,**
**Appellee.**

No. 16915.

Court of Civil Appeals of Texas.

Dallas.

May 19, 1967.

Rehearing Denied June 2, 1967.

627

Chester Ball of Harris & Ball, Arlington, for appellant.

Byron L. Falk & Robt. G. Vial of Akin, Vial, Hamilton, Koch & Tubb, Dallas, for appellee.

CLAUDE WILLIAMS, Justice.

The crucial question presented by this workmen's compensation case is whether Jearl E. Goodnight was an employee, within the meaning of the Workmen's Compensation Act, of E. C. Houston at the time he sustained his injuries made the basis for his claim for compensation against Zurich Insurance Company. The trial court sustained the motion for summary judgment presented by Zurich, and decreed that Goodnight take nothing against such company. Goodnight appeals and contends, in four points of error, that at the time he was injured he did occupy the status of employee of Houston inasmuch as one L. F. McDonald, acting as either agent or employee of Houston, had hired him to work for Houston.

The material facts are practically without dispute. Appellant Goodnight, at the time he sustained his injuries on April 13, 1964, was an experienced welder and a full time employee of Frank Garland who owned and operated a welding shop. Occasionally Goodnight undertook to do other welding jobs outside the shop and at times which did not interfere with his regular employment. He had previously done work for certain of Mr. Garland's customers outside the shop on odd jobs but on such occasions he was paid through his employer, Mr. Garland. L. F. McDonald was also an experienced welder and had worked for Garland in past years. Welding work was divided into two categories, "in-shop" and "job site" jobs. The former work was accomplished inside the shop and delivered to customers while the latter was performed on the job site itself. Goodnight had worked regularly for Garland doing "in-shop" welding work and also, as stated, had done odd jobs at odd times doing "job site" welding work for Garland's customers. McDonald did job site welding for customers of Garland's shop.

E. C. Houston was a master electrician and the controlling partner in E. C. Houston Electric Company. Garland had done welding work for Houston over a number of years.

The City of Dallas solicited bids from contractors in connection with opening and remodeling the lighting facilities at three city parks. Houston was interested in obtaining the general contract on this proposal by the city. Houston contacted Garland and obtained from him a quotation on costs for the welding portions of the work required by the city's plans and specifications. Houston was successful in obtaining the general contract from the city to do the work whereupon he orally subcontracted the "in-shop" welding to Garland.

It became evident that Houston would also need welding done at the parks themselves, that is, "job site" welding. He thereupon asked Garland to subcontract that work also. Garland declined the "job site" work but recommended L. F. McDonald to do that work. McDonald called Houston and the two consulted the plans and specifications promulgated by the city. McDonald quoted a price for drilling holes and doing the welding at the three parks, on a piece work basis, of $3.00 per pole which represented welding a hole at the top and a hole at the bottom of each pole. McDonald and Houston then entered into an oral agreement on that basis and McDonald proceeded to do all the work at the first park. When it was subsequently discovered that some of the poles would require one hole at the top, which was the harder work, Houston agreed to pay, and McDonald agreed to accept, $4.00 per hole and their contract was therefore renegotiated upon that basis.

McDonald had also entered into an arrangement with Garland, before starting to work at the park jobs, whereby McDonald agreed to pay Garland a certain percentage of what he received from the contract with Houston and in return Garland furnished McDonald with the equipment to be used in the performance of the Houston-McDonald contract. The equipment included a portable welding machine, trailer, safety belt, ladder and a pickup truck.

McDonald's job was a one-man operation. He had no regular employees to aid or assist him in the work. After performing a part of the contract McDonald decided, for health reasons, that he was not physically able to do any more of the work which required climbing the poles. McDonald testified that he went to Houston and asked him if he knew of someone to help him and Houston replied that he did not know of anyone. In this regard McDonald said:

"A What I told Mr. Garland was that I wasn't going to be able to do it, and Houston asked me to, or, well, he didn't ask me to, I take that back, he said he didn't know of anyone that could do it. And I told him I would try to find someone to help him do it, even if I had to help him. And, so I came on down to the shop and was talking to Mr. Garland and Mr. Goodnight, and Mr. Goodnight said he would go out there and do it for me on his own hours."

McDonald testified that he did not ask Houston to back out of the contract or break the contract nor did he "renege" on the contract or ask that it be renegotiated. He testified that he approached Garland while Goodnight was present, and asked Garland for his help or. for recommendation of a man to help him. Goodnight spoke up and offered to do the climbing work. Garland spoke up and said that Goodnight could not do it while he was working for him but that if Goodnight wanted to do it on weekends or after hours he had no objection. Goodnight and McDonald entered into the arrangement whereby Goodnight would do the work on the poles. With reference to payment McDonald testified:

"Q Well, what was your arrangement with Mr. Goodnight, what did you offer him?

"A Well, I just told him I would give him what, in other words, what I would get out of it. I wasn't getting nothing out of it."

McDonald did not tell Houston that he was going to use Goodnight and Houston did not know until after the accident that Goodnight was working on the poles. McDonald said that he gave instructions to Goodnight as to what to do:

"Q Now, did you go over with Mr. Goodnight what Mr. Houston had told you how he wanted the work done?

"A No, not particular, I just told where I wanted the holes and where to put them, and he went up there and started burning them.

"Q Well, you had given him the same instructions that you had received?

"A Yes."

At 4:00 P.M. on April 13, 1964, about an hour and a half before Goodnight was to get off work at the Garland shop, McDonald came to the shop and he and Goodnight obtained Garland's permission for Goodnight to leave early so that he could go to the park and do the work on the poles. Shortly after their arrival at the park, which was the first time Goodnight had done any work on the job, and while Goodnight was up on a pole fixing to drill a hole with a cutting torch, and while McDonald was on the ground to tie the welding machines and cutting torch to Goodnight's rope, Goodnight's safety belt broke and he fell to the ground sustaining serious injuries.

After Goodnight's injuries McDonald completed the job with the help of employees of Budd's Welding Shop, whom he had engaged on a piece work basis. McDonald stated that he made a profit on that work. Later, McDonald went to Goodnight and offered to pay him for the work but Goodnight refused to accept the money.

Goodnight was not listed on Houston's books as an employee nor did Houston withhold any Social Security or other deductions from money paid on the job. Neither did McDonald withhold Social Security or other benefits for Goodnight.

We have carefully reviewed the entire record in the light of the familiar rules an-

nounced by our Supreme Court in both Gulbenkian v. Penn, 151 Tex. 412, 252 S.W.2d 929 (1952), and Great American Reserve Ins. Co. v. San Antonio Plumbing Supply Co., 391 S.W.2d 41 (1965), and having done so we are convinced, and so hold, that no issue of fact on the question of employment by Houston was presented and therefore the trial court was correct in granting appellee's motion for summary judgment. Appellant's points must be overruled and the judgment affirmed.

◼ Appellant contends that the record demonstrates that McDonald, acting either as agent or employee of Houston, hired him to do the work that he was performing at the time he sustained his injuries. He points to McDonald's statement in his deposition that he told Houston that he felt personally unable to complete the job and that he would attempt to get someone else to do it for him. While we recognize the rule of law that a person may be employed by an agent or employee of an employer to do certain work we fail to find evidence of probative force to bring appellant within that rule. We think that appellant's status at the time he sustained his injuries must be determined by all of the facts and circumstances surrounding his work at that time.

◼ The disposition of this case is governed by the opinion of our Supreme Court in Anchor Casualty Co. v. Hartsfield, 390 S.W.2d 469 (1965). In that case Smith was a general contractor who subcontracted all the carpentry work on an apartment house to Wolff, who in turn engaged Hartsfield to do the trim and finish work in the building. Hartsfield furnished his own tools, was paid a flat sum for work on each apartment, and was not carried on the payroll of Wolff, nor were Social Security or income taxes withheld from his salary by Wolff. Hartsfield was not required to be at work or to quit at any particular time nor to work any particular hours a day. In holding that Hartsfield was an independent contractor, as a matter of

law, and not an employee of Wolff, under Art. 8309, Sec. 1, Texas Revised Civil Statutes, the Supreme Court said:

"The burden of proof was upon Hartsfield to show that at the time of his injury he was an employee within the meaning of the Workmen's Compensation Act. The parties agree that right of control is the determinative test of whether the workman is an employee or an independent contractor, and hence whether or not the workman qualifies for compensation under the Act."

◼ The Supreme Court said that the record failed to reveal any evidence to demonstrate that Wolff had the right to control the details of Hartsfield's employment but that all he expected was to control the end results of Hartsfield's efforts. The Supreme Court then set forth the controlling factors in determining the status of an employee, as follows:

"The facts that the work by Hartsfield required some special skill, that he furnished his own tools, that he was doing a particular job according to predetermined plans, that he could come to work and leave at times within his discretion, that he was paid by the job, and that he was not carried on the payroll or on social security and income tax withholding rolls of Wolff, establish that Hartsfield was an independent contractor." (Citing authorities.)

When we apply the six controlling factors laid down by the court to the details of work done by Goodnight we find that he occupied the same relationship to Houston as Hartsfield did to Wolff. First, as to the element of special skill, the record reveals that both McDonald and Goodnight were experienced welders. Houston was an electrician. Obviously Houston was not equipped to do the welding job, either in person or through employees. He subcontracted this portion of the work to McDonald who, in turn, turned the job over to Goodnight to be carried on in the same manner. The only thing

Houston was interested in was to see that a hole was cut in the pole and a nipple welded in it for wires to go through according to the city plans and specifications. No one connected with Houston directed.Goodnight or McDonald as to what to do, how to get to the job, how to climb the poles, how to place the ladders, or any of the other details of the work. Both McDonald and Goodnight were depending upon their skill and experience as welders and not upon instructions from Houston.

■ Secondly, it is undisputed that the tools and equipment used by both Goodnight and McDonald were furnished by Garland by virtue of McDonald's contract with him whereby Garland was to receive a percentage of the job. Houston had no knowledge of the agreement between Garland and McDonald but assumed that McDonald would provide all equipment and tools necessary. Appellant argues that Houston did provide the couplings and nipples that were attached to the poles but this fact alone does not change his status. In Traders & General Ins. Co. v. Ferris, 312 S.W.2d 311 (Tex.Civ.App., Amarillo 1958, writ ref'd), the court held as a matter of law that the furnishing of blocks, cement and sand, by the general building contractor to the subcontractor who was to lay the blocks while building a gasoline station for a certain sum per block, did not make the subcontractor, or his helpers, employees of the general contractor for workmen's compensation.

Thirdly, as to plans and specifications, Houston showed McDonald such plans and told him where the welding was to be done. McDonald told Goodnight where he wanted the holes put in the poles. Houston did not tell Goodnight anything about the job nor was he on the job site telling either McDonald or Goodnight what to do. Houston merely wanted the plans and specifications complied with by those who knew how to do the work.

Fourthly, as to working hours, nothing was said about the length of time to be required on the job. McDonald was not required to be at any certain park at any certain hour nor was he required to leave at any certain hour. He could come and go as he pleased. Goodnight was to work at odd hours which did not interfere with his regular work with Garland.

Fifthly, as to payment, it is undisputed that McDonald was to be paid so much per pole by Houston. McDonald and Goodnight had reached no final financial agreement between themselves but McDonald said that he told Goodnight he would get whatever he he had coming from the job. Houston made no arrangements with Goodnight concerning payment.

Sixth, and finally, as to payment of Social Security and withholding taxes, McDonald was not carried on Houston's payroll, Social Security and withholding tax records, and Houston did not report McDonald as an employee to his workmen's compensation carrier. Houston did not pay Goodnight anything nor did he offer to pay him anything.

■ The fact that Houston may have had broad and general supervisory control over the job performed by McDonald does not bring the case within the element of right of control as discussed by the Supreme Court in *Hartsfield*, supra. This question was thoroughly discussed by the court in Travelers Ins. Co. v. Brown, 395 S.W.2d 701 (Tex.Civ.App., Texarkana 1965, writ ref'd n.r.e.). The mere fact that a general contractor has a right to supervise the work to see that the plans and specifications are being complied with by a subcontractor does not amount to such control or right of control as would change the status between the parties.

■ Appellant takes the position that the contract between the City of Dallas and Houston contains a provision which prohibits Houston from making subcontracts without written consent of the city. Therefore, says appellant, any subcontract with Mc-

Donald was illegal and void and all that McDonald could do was to hire Goodnight to work for Houston. This contention is without merit and must be rejected. The same contention was asserted in Carter Publications, Inc. v. Davis, 68 S.W.2d 640 (Tex. Civ.App., Waco 1934, writ ref'd), in which the party seeking to establish an employer-employee relationship asserted that the individual in question had to be an employee because the written contract was legally void. The court rejected this contention saying that even if the original contract was void it would not "result in the creation of the relationship of master and servant between such parties. The relationship of master and servant does not spring up of its own accord, but must be created by the parties by mutual agreement either expressed or implied." Even if Houston had no legal power under his general contract with the city to subcontract the welding work, insofar as Goodnight is concerned the relationship between McDonald and Houston was that of principal and independent contractor. As the court said in *Carter*, supra:

"If it be conceded that the contract was void and could not be enforced by either party against the other, yet as to third parties it furnished proof of the understanding between the parties thereto as to who should have control over the physical conduct of those who were to perform the work in question."

See also Travelers Ins. Co. v. Brown, supra.

In summary, it appears plain from the record that Houston, an electrician, obtained a general contract from the City of Dallas to do certain work and a portion of such work involved welding which was not within Houston's specialized field. He subcontracted this work to McDonald who, when he found it impractical or impossible to physically complete the work, turned it over to Goodnight, also an experienced welder. There was no actual contact between Goodnight and Houston. We find no evidence of probative force to establish that McDonald was either the employee or agent of Houston or that he contracted with Goodnight to work for Houston as an employee. All of the evidence points to the contrary and demonstrates conclusively that Goodnight, at the time of the receipt of his injuries, was an independent contractor or an employee of an independent contractor, McDonald. Smith v. Fireman's Ins. Co. of Newark, N. J., 398 S.W.2d 435 (Tex.Civ.App., Houston 1966, no writ).

Finding no evidence of probative force in this record that would create an issue of fact, we overrule appellant's points and affirm the judgment.

Affirmed.