TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN



 



NO. 03-98-00053-CV






Alvis Kent Waldrep, Jr., Appellant



v.



Texas Employers Insurance Association, in Receivership; and

Texas Property and Casualty Insurance Guaranty Association, Appellees






FROM THE DISTRICT COURT OF TRAVIS COUNTY, 201ST JUDICIAL DISTRICT


NO. 93-03451, HONORABLE JOSEPH H. HART, JUDGE PRESIDING 






 Appellant Alvis Kent Waldrep, Jr. was awarded workers' compensation benefits
by the Texas Workers' Compensation Commission (the "Commission") for an injury he sustained
while playing football for Texas Christian University ("TCU"). Appellee Texas Employers
Insurance Association, in receivership, Texas Property and Casualty Insurance Guaranty
Association appealed the award to the district court. (1) Following a trial de novo, (2) a jury found that
Waldrep had failed to prove that he was an employee of TCU at the time of his injury. The
district court rendered judgment that Waldrep take nothing against TEIA. Waldrep appeals the
judgment, claiming that (1) he was an employee as a matter of law and (2) the district court erred
in admitting and excluding certain evidence at trial. We will affirm the district court's judgment.


BACKGROUND

 Waldrep graduated from high school in Alvin, Texas in 1972. During his junior
and senior years, TCU was among many schools interested in recruiting Waldrep, a young man
known for his athletic ability as well as his good academic record. Tommy Runnels, a TCU
assistant football coach, visited Waldrep frequently at his home and school, attempting to interest
Waldrep in TCU's football and academic programs. During one home visit, Waldrep's mother
asked Runnels what would happen if Waldrep were injured during his football career at TCU. 
Runnels assured Waldrep and his family that TCU would "take care of them" and emphasized that
Waldrep would keep his scholarship even if he were injured and could not play football.

 Waldrep was very impressed with the facilities at TCU and believed that his
abilities would fit in well with TCU's football program. He was also aware that recruitment and
his future involvement in athletics at TCU were governed by the rules of the Southwest Athletic
Conference ("Southwest Conference") (3) and the National Collegiate Athletic Association
("NCAA"). To affirm his intent to attend school at TCU and participate in TCU's football
program, Waldrep signed two documents. First, Waldrep signed a pre-enrollment form ("Letter
of Intent"), (4) which demonstrated his formal desire to play football for TCU and penalized him if
he decided to enter a different school within the Southwest Conference. (5) Waldrep later signed a
financial aid agreement ("Financial Aid Agreement"), (6)
 ensuring that Waldrep's room, board, and
tuition would be paid while attending TCU and that Waldrep would receive ten dollars per month
for incidentals. This cash payment was generally referred to as "laundry money." Both
documents were contingent on Waldrep's meeting TCU's admission and scholastic requirements
for athletic awards. 

 In August 1972, Waldrep enrolled at TCU. In October 1974, while playing
football for TCU against the University of Alabama, Waldrep was critically injured. He sustained
a severe injury to his spinal cord and was paralyzed below the neck. Today, Waldrep has no
sensation below his upper chest. In 1991, Waldrep filed a workers' compensation claim for his
injury. (7) The Commission entered an award in his favor. TEIA appealed this decision to the
district court. In a trial de novo, a jury found that Waldrep was not an employee of TCU at the
time of his injury. The district court rendered judgment in favor of TEIA. On appeal, Waldrep
presents five issues. The first addresses whether, as a matter of law, Waldrep was an employee
of TCU. (8) The final four challenge various evidentiary rulings made by the district court.


DISCUSSION

Status as an Employee for Workers' Compensation Purposes By his first issue, Waldrep asserts that at the time of his injury he was an employee
of TCU as a matter of law. We begin by noting that Waldrep is attacking the legal sufficiency
of an adverse answer to a jury question on which he had the burden of proof. After hearing all
of the evidence, the jury declined to find that Waldrep was an employee of TCU at the time of
his injury. (9) When reviewing a legal-sufficiency point of error that attempts to overcome an
adverse jury finding as a matter of law, appellate courts must employ a two-prong test. See
Sterner v. Marathon Oil Co., 767 S.W.2d 686, 690 (Tex. 1989); Circle C Child Dev. Ctr., Inc.
v. Travis Cent. Appraisal Dist., 981 S.W.2d 483, 485 (Tex. App.--Austin 1998, no pet.); Oram
v. State Farm Lloyds, 977 S.W.2d 163, 168 (Tex. App.--Austin 1998, no pet.). First, we examine
the record for evidence that supports the finding, considering only the evidence and inferences that
lend support to the finding, while disregarding all evidence and inferences to the contrary. See
Burroughs Wellcome Co. v. Crye, 907 S.W.2d 497, 499 (Tex. 1995); Sterner, 767 S.W.2d at
690. If there is no evidence to support the finding, we then review the entire record to see if the
contrary proposition is established as a matter of law. See Sterner, 767 S.W.2d at 690.

 Our initial inquiry is whether the evidence is legally sufficient to support the jury's
refusal to find that Waldrep was an employee of TCU. We will uphold the jury's finding if more
than a mere scintilla of evidence supports it. See Crye, 907 S.W.2d at 499; Stafford v. Stafford,
726 S.W.2d 14, 16 (Tex. 1987). A scintilla has been defined as "a barely perceptible
manifestation," "the slightest particle or trace," and "a spark; a remaining particle; a trifle; the
least particle." W. Wendell Hall, Standards of Review in Texas, 29 St. Mary's L.J. 351, 480
n.858 (1998) (quoting Webster's Third New International Dictionary 2033 (Philip B. Gove ed.,
1986) and Black's Law Dictionary 1207 (5th ed. 1979)). Evidence amounts to more than a mere
scintilla "when the evidence supporting the finding, as a whole, 'rises to a level that would enable
reasonable and fair-minded people to differ in their conclusions.'" Merrell Dow Pharmaceuticals,
Inc. v. Havner, 953 S.W.2d 706, 711 (Tex. 1997) (citing Crye, 907 S.W.2d at 499 (quoting
Transportation Ins. Co. v. Moriel, 879 S.W.2d 10, 25 (Tex. 1994))). 

 Therefore, the question presented to this Court is whether there is some evidence
(more than a mere scintilla) supporting the jury's failure to find that Waldrep was an employee
of TCU at the time of his injury. Stated another way, could any reasonable and fair-minded
person conclude that Waldrep was not employed by TCU when injured? We answer this question
affirmatively.

 We are confronted with a situation novel to Texas jurisprudence: whether, for
workers' compensation law purposes, a recipient of a scholarship or financial aid from a
university becomes that university's employee by agreeing in return to participate in a university-sponsored program. Cases decided under the various workers' compensation statutes in effect
from time to time have almost uniformly determined the existence of an employer-employee
relationship by an analysis of whether the claimant of workers' compensation benefits was an
employee as distinguished from an independent contractor. See, e.g., Thompson v. Travelers
Indem. Co., 789 S.W.2d 277, 278 (Tex. 1990); Newspapers, Inc. v. Love, 380 S.W.2d 582, 583
(Tex. 1964). These authorities do not conveniently overlay the facts presented here, as there is
no allegation that Waldrep was an independent contractor. Yet they are instructive in one
significant aspect: one may receive a benefit from another in return for services and not become
an employee.

 The jury charge defined "employee" as "a person in the service of another under
a contract of hire, express or implied, oral or written, whereby the employer has the right to
direct the means or details of the work and not merely the result to be accomplished." (10) Thus,
in failing to find that Waldrep was TCU's employee, the jury may have believed that there was
no contract of hire between Waldrep and TCU or, if there was, it did not give TCU the right to
direct the means or details of Waldrep's "work." We will examine both possibilities.


Existence of Contract of Hire

 For the purpose of workers' compensation law, the employer-employee relationship 
may be created only by a contract. See United States Fidelity & Guar. Co. v. Goodson, 568
S.W.2d 443, 445-46 (Tex. Civ. App.--Texarkana 1978, no writ). Waldrep strongly urges that the
Letter of Intent and Financial Aid Agreement are express contracts of hire that set forth the terms
of Waldrep's "employment." However, we do not find these documents to be so clear. At best,
they only partially set forth the relationship between Waldrep and TCU. By their terms, they
generally bound Waldrep to TCU to the exclusion of other Southwest Conference schools, if he
intended to participate in athletics, and extended him financial aid so long as he complied with the
admission and scholastic requirements of TCU and the rules and regulations of both TCU and the
Southwest Conference. These requirements, rules, and regulations are not specifically described
in either of the agreements. Nor does the record in this case set them forth in any detail. The
Letter of Intent and Financial Aid Agreement are also silent with regard to whether any rules or
regulations of the NCAA would apply to Waldrep or affect his relationship with TCU. Yet it is
undisputed that before Waldrep signed the Letter of Intent and Financial Aid Agreement, both he
and TCU understood that his recruitment and future football career at TCU would be governed
by and subject to the rules of the NCAA.

 TEIA, on the other hand, posits that Waldrep clearly and simply did not have a
contract of hire. TEIA directs us to Travelers Insurance Co. v. Brown, 395 S.W.2d 701 (Tex.
Civ. App.--Texarkana 1965, writ ref'd n.r.e.), and Carnes v. Transport Insurance Co., 615
S.W.2d 909 (Tex. Civ. App.--El Paso 1981, writ ref'd n.r.e.), to support its proposition. 
However, both involve the intervention of a third party and are therefore distinguishable from the
case before us. In Brown, Louis contracted with Smith to clean the interior walls of a building. 
Louis then hired Brown to actually do the work. The court of civil appeals held that Brown was
not Smith's employee because there was no evidence "of an intention on Smith's part to empower
Louis to employ workmen for Smith." Brown, 395 S.W.2d at 702. In Carnes, Carnes was held
not to be an employee of Thrasher while driving a truck leased by Courtney to Thrasher when
there was no evidence that Thrasher would pay Carnes, either directly or through Courtney, for
Carnes's operation of the vehicle. See Carnes, 615 S.W.2d at 912. Neither case, when applied
to the facts of Waldrep's relationship with TCU, leads inexorably to the conclusion that there was
no contract of hire.

 Mindful of the district court's definition of employee, the jury was left to determine
if there was a "contract of hire" between Waldrep and TCU. We observe that "the most basic
policy of contract law . . . is the protection of the justified expectations of the parties." DeSantis
v. Wackenhut Corp., 793 S.W.2d 670, 677 (Tex. 1990). Was it the expectation of Waldrep and
TCU that Waldrep would become TCU's employee? To form a contract, the parties must
mutually assent to its terms. Whether there is such assent is determined "based on objective
standards of what the parties said and did and not on their alleged subjective states of mind." 
American Nat'l Ins. Co. v. Paul, 927 S.W.2d 239, 244 (Tex. App.--Austin 1996, writ denied)
(quoting Adams v. Petrade Int'l, Inc., 754 S.W.2d 696, 717 (Tex. App.--Houston [1st Dist.] 1988,
writ denied)). Because the Letter of Intent and Financial Aid Agreement do not evidence the
entire agreement between Waldrep and TCU, we consider them against "the background of
circumstances surrounding [their] execution." Brown, 395 S.W.2d at 702 (citing Allison v.
Campbell, 298 S.W. 523 (Tex. Comm. App. 1927, opinion adopted)). We may also look to the
parties' conduct after execution of the documents, and such conduct "may be a strong factor in
determining just what the real agreement contemplate[d]." Maryland Cas. Co. v. Brown, 115
S.W.2d 394, 396 (Tex. 1938).

 On the facts of this record, any contract of hire must have been a contract whereby
TCU hired Waldrep to attend the university, remain in good standing academically, and play
football. However, if Waldrep played football for pay, he would have been a professional, not
an amateur. (11) The evidence reflects that the actions of both Waldrep and TCU were consistent
with a joint intention that Waldrep be considered an amateur and not a professional. It is
undisputed that before Waldrep signed the Letter of Intent and Financial Aid Agreement, both he
and TCU understood that his recruitment and future football career at TCU would be governed
by and subject to the rules of the NCAA. The record indicates that the NCAA's policies and rules
in effect at that time exhibited a concerted effort to ensure that each school governed by these
rules made certain that student-athletes were not employees. Indeed, the rules declared that the
fundamental policy of the NCAA was "to maintain intercollegiate athletics as an integral part of
the educational program and the athlete as an integral part of the student body, and, by so doing,
retain a clear line of demarcation between college athletics and professional sports." NCAA
Manual at 5. Following its policy, the evidence reflects that the NCAA rules made the principle
of amateurism foremost and established several requirements to ensure that the student-athlete
would not be considered a professional. See id. at 6. For example, the NCAA had strict rules
against student-athletes taking pay for participation in sports, and student-athletes were ineligible
to participate if they were receiving or had received a salary from a professional sports
organization. See id. at 5-6.

 Additionally, the record reflects that Waldrep and TCU did not treat the financial
aid Waldrep received as "pay" or "income." First, as previously noted, the NCAA rules
provided that student-athletes would be ineligible if they used their skill for pay in any form;
however, that same rule goes on to state that "a student-athlete may accept scholarships or
educational grants-in-aid from his institution" as these benefits do not conflict with the NCAA
rules. Id. As the NCAA rules were based upon a principle of amateurism and strictly prohibited
payment for play, these two provisions together indicate that the NCAA and its participating
institutions did not consider the acceptance of financial aid from the institution to be "taking pay."
 Moreover, the rules provided that any financial aid that exceeded tuition and fees, room and
board, required course-related supplies and books, and incidental expenses of fifteen dollars per
month would be considered "pay" for participation in intercollegiate athletics. See id. at 8. TCU
gave Waldrep financial aid for these items but nothing more, indicating that TCU did not intend
to pay Waldrep for his participation. Of equal significance, TCU never placed Waldrep on its
payroll, never paid him a salary, and never told him that he would be paid a salary. There is no
evidence that Waldrep expected a salary. No social security or income tax was withheld from
Waldrep's grant-in-aid. See Continental Ins. Co. v. Wolford, 526 S.W.2d 539, 540 (Tex. 1975)
(withholding taxes is indicia of employee status). Waldrep never filed a tax return reporting his
financial aid. See Anchor Cas. Co. v. Hartsfield, 390 S.W.2d 469, 470 (Tex. 1965); Mayo v.
Southern Farm Bureau Cas. Ins. Co., 688 S.W.2d 241, 243 (Tex. App.--Amarillo 1985, writ ref'd
n.r.e.). (12), (13)

 The evidence further reflects that Waldrep and TCU intended that Waldrep
participate at TCU as a student, not as an employee. During the recruitment process, TCU never
told Waldrep that he would be an employee, and Waldrep never told TCU that he considered
himself to be employed. Moreover, a basic purpose of the NCAA, which governed Waldrep's
intercollegiate football career, was to make the student-athlete an integral part of the student body. 
See NCAA Manual at 5. According to the NCAA rules, "[a]n amateur student-athlete is one who
engages in athletics for the education, physical, mental and social benefits he derives therefrom,
and to whom athletics is an avocation." Id. at 6. Of importance is the evidence that Waldrep was
aware when he signed the Letter of Intent and Financial Aid Agreement that he would still receive 
financial aid even if hurt or unable to play football, as long as he complied with the rules of the
Southwest Conference. Thus, TCU could not "fire" Waldrep as it could an employee. See Mayo,
688 S.W.2d at 243. In addition, when Waldrep signed the agreements, he still had to meet the
scholastic requirements for athletic awards and qualify for admission to TCU in order to enroll
and participate in the football program. Waldrep testified that he knew when he signed the
agreements that in order to play football at TCU he would have to maintain certain academic
requirements as a student. Thus, his academic responsibilities dictated whether he could continue
to play football.

 Financial-aid awards are given to many college and university students based on
their abilities in various areas, including music, academics, art, and athletics. Sometimes these
students are required to participate in certain programs or activities in return for this aid. But,
as the Supreme Court of Indiana observed, "[s]cholarship recipients are considered to be students
seeking advanced educational opportunities and are not considered to be professional athletes,
musicians or artists employed by the [u]niversity for their skill in their respective areas." Rensing
v. Indiana State Univ. Bd. of Trustees, 444 N.E.2d 1170, 1174 (Ind. 1983).

 Although the record in this case contains facts from which the jury could have
found that Waldrep and TCU were parties to a contract of hire, there is also probative evidence
to the contrary. Viewing the evidence in the light most favorable to the jury's verdict, we hold
that the record before us reflects more than a mere scintilla of evidence that Waldrep was not in
the service of TCU under a contract of hire.



Right to Direct the Means or Details of Waldrep's Work

 If, however, we assume the jury found that a contract existed between Waldrep and
TCU, we must determine whether there is some evidence concerning TCU's right to direct the
means or details of Waldrep's "work." The definition of "employee" submitted to the jury
correctly states the recognized test to determine whether an employer-employee relationship exists: 
the right of the employer to direct or control the means or details of the employee's work. See
Mayo, 688 S.W.2d at 243 (ultimate test in deciding employment question is right of alleged
employer to control specifics of worker's performance) (citing Hartsfield, 390 S.W.2d at 471). 
To determine whether there is a right of control, "we first must look to the terms of the
employment contract." Allstate Ins. Co. v. Scott, 511 S.W.2d 412, 414 (Tex. Civ. App.--El Paso
1974, writ ref'd n.r.e.). Where there is no express contract or where the terms of the contract
are indefinite, the exercise of control "may be the best evidence available to show the actual terms
of the contract." Newspapers, Inc. v. Love, 380 S.W.2d 582, 590 (Tex. 1964); see Scott, 511
S.W.2d at 414. However, "'the right to control' remains the supreme test and the 'exercise of
control' necessarily presupposes a right to control which must be related to some agreement
expressed or implied." Love, 380 S.W.2d at 590 (emphasis added); see Scott, 511 S.W.2d at 414
("the exercise of control, while evidentiary only and not the true test, is the best evidence
available in determining the right of control").

 The record reflects that TCU exercised direction and control over all of the athletes
in its football program, including non-scholarship players, while they were participating in the
football program. Waldrep admitted that his high school coaches exercised the same type of
control over his participation in sports as the coaches at TCU. Waldrep further testified that he
did everything that the coaches told him to do because he wanted to, because he loved the game,
and because he wanted to be the best, not because he had to. The evidence is clear that TCU did
not have the right to direct or control all of Waldrep's activities during his tenure at the school. 
The NCAA rules protected Waldrep's financial-aid award even if his physical condition prevented
him from playing football for any reason. See NCAA Manual at 8. Moreover, TCU could not
simply cancel Waldrep's grant-in-aid based on his "athletic ability or his contribution to [the]
team's success," or even, in certain circumstances, if he quit. Id.

 The fact that the athletic department at TCU established practice and meeting times
to be observed by those playing football does not establish that TCU had the right to direct and
control all aspects of the players' activities while enrolled in the university. See Hartford Accident
& Indem. Co. v. Hooten, 531 S.W.2d 365, 368 (Tex. Civ. App.--San Antonio 1975, writ ref'd
n.r.e.) (fact that hospital established regulations and rules to be observed by private-duty nurses
is no evidence of existence of employer-employee relationship). Waldrep's acceptance of financial
aid from TCU did not subject him to any extraordinary degree of control over his academic
activities.

 Waldrep clearly presented evidence that TCU exercised direction or control over
some of his activities while a student at the university. Perhaps the jury might have found this
sufficient to prove that TCU had the right to direct the means or details of Waldrep's activities,
but the jury declined to do so. Viewing the evidence in the light most favorable to the jury's
verdict, we hold that the record before us reflects more than a mere scintilla of evidence disputing
TCU's right of control.

 On appeal, Waldrep bears a heavy burden in seeking reversal and rendition based
on an adverse finding to a jury issue on which he had the burden of proof. The record before us
reflects evidence both for and against the jury's finding. The district court properly left the jury
to determine the issue of employment. The circumstances presented in the record before us do
not establish an employer-employee relationship as a matter of law. We hold that there is some
evidence to support the jury's verdict declining to find that Waldrep was an employee of TCU at
the time of his injury. Waldrep has failed to satisfy Sterner's first prong. See Sterner, 767
S.W.2d at 690. (14) Therefore, we overrule Waldrep's first issue.


Evidentiary Issues

 Waldrep argues in his last four issues that the district court erred in admitting and
excluding certain evidence on relevancy grounds. Admitting and excluding evidence are matters
within the discretion of the trial court; thus, a trial court's ultimate decision in this regard is
reviewed under an abuse-of-discretion standard. See City of Brownsville v. Alvarado, 897 S.W.2d
750, 753 (Tex. 1995); Murphy v. Seabarge, Ltd., 868 S.W.2d 929, 932 (Tex. App.--Houston
[14th Dist.] 1994, writ denied). A court abuses its discretion only when it acts in an unreasonable
and arbitrary manner, or when it acts without reference to any guiding principles. See Beaumont
Bank, N.A. v. Buller, 806 S.W.2d 233, 236 (Tex. 1991); Downer v. Aquamarine Operators, Inc.,
701 S.W.2d 238, 241-42 (Tex. 1985). This Court may not reverse a trial court's ruling for an
abuse of discretion merely because we may disagree with that decision. See Buller, 806 S.W.2d
at 226; Downer, 701 S.W.2d at 242.

 Evidence is relevant if it has "any tendency to make the existence of any fact that
is of consequence to the determination of the action more probable or less probable than it would
be without the evidence." Tex. R. Evid. 401. All relevant evidence is admissible unless its
probative value is substantially outweighed by the danger of unfair prejudice, confusion of the
issues, or misleading the jury. See id. 402, 403. If a party objects to evidence on these grounds,
the trial court must conduct a balancing test, weighing the danger of prejudice against the
probative value of the evidence. See McLellan v. Benson, 877 S.W.2d 454, 457 (Tex. App.--
Houston [1st Dist.] 1994, no writ). "Evidence which is not relevant is inadmissible." Tex. R.
Evid. 402. 


Walter Byers's Deposition

 Waldrep first asserts that the district court erred in excluding the deposition of
Walter Byers. Byers was the executive director of the NCAA from 1952 to 1988. In 1995, more
than six years after he left the NCAA and more than twenty years after Waldrep's injury, Byers
wrote a book entitled Unsportsmanlike Conduct, in which he expresses his opinions on what he
asserts to be the exploitation of college athletes. The district court excluded Byers's deposition,
concluding that the testimony was irrelevant and to the extent that it was relevant, its relevance
was far outweighed by its prejudicial effect.

 Byers prefaced his deposition with the following statement:


Well, I was just going to make this comment that I came here to answer any
questions concerning a book I've written, Unsportsmanlike Conduct is the name,
exploiting college athletes published by the University of Michigan Press. And I
know I have no informed information of any particular insights into the incident
in question which occurred in a football game involving TCU and Alabama, nor
do I have any particular knowledge of the Texas rules and regulations that apply
to the various agencies that may be involved here. So I wanted to make the simple
point that I'm pleased to answer any questions related to what I have written in my
book, and that's really why I agreed to participate in these proceedings.



Byers also admitted that when he headed the NCAA he never voiced the opinions that he espouses
throughout his book. 

 At many points throughout his deposition, Byers expressed his opinions of the
NCAA, its rules, and how these rules could be better; however, he failed to point to anything
supporting his opinions or discuss how his views relate to Waldrep's status as an employee while
at TCU. For example, Byers noted that the central argument in his book is that "the athlete [is]
already . . . under contract on a pay scheme that is set in place by the national body and it's time
to change that," recommending that "the one-year pay scheme, a contract for pay, is outdated and
there should be drastic changes in the rules." (Emphasis added.) Byers later opined:


[C]ollege athletics has become a national major league entertainment business and
millions upon millions of new dollars have flown into the system. . . . Television
not only changed the face of college athletics, . . . it changed the very heart and
soul because the management of college athletics looked at these negotiations and
the contracts they were signing for big dollars as this is strictly a business
enterprise. And I think that attitude has affected substantially the way the colleges
deal with their students . . . .



And Byers concluded his testimony by summarizing his book's main argument:



[T]he athlete is unfairly restricted by the financial aid rules . . . which are imposed
upon him by the people who benefit most from this billion-dollar entertainment
industry. And the rules governing the athlete should be liberalized and changed. 



Byers's opinions and references to his book for support throughout his deposition clearly are not
probative of whether Waldrep was an employee of TCU at the time of his injury. In addition, the
danger that his rhetoric would result in unfair prejudice was particularly great given Byers's
background and apparent knowledge.

 Byers reviewed the history of the NCAA and the evolution of its rules. 
Specifically, Byers asserted that a grant-in-aid system was created in 1956 to provide athletes their
educational expenses and "to get rid of under-the-table payments" to athletes. Waldrep several
times asked Byers to describe how the phrase "student-athlete" came into being. Waldrep argues
that the origin of the term is relevant because it is used in the Letter of Intent and was coined "to
avoid liability under worker's compensation laws." Byers, however, never directly answered the
question. He related that when the grant-in-aid program became permissible under NCAA rules,
"cases arose and the arguments were being made that the [g]rant-in-aid was solely a stipend given
to a player to play athletics." The NCAA's member institutions were concerned that a grant-in-aid would be considered a contract for play. The NCAA amended its rules "to put student first
ahead of athlete and to emphasize that although they are getting a [g]rant-in-aid, they have to be
a student first and an athlete second." Byers went on to say that the NCAA created "a number
of safeguards around awarding a [g]rant-in-aid to make it clear the intent was education first and
sports competition second." Appended to Byers's deposition were two memoranda. The first,
dated July 1964, was authored by Marcus L. Plant, who was described by Byers as a professor
of law at the University of Michigan, and describes then-current case-law application of workers'
compensation laws to students who also participated in athletics at colleges and universities. This
memorandum was apparently distributed at a meeting of the NCAA counsel (the policy-making
group of the NCAA) in the summer of 1964. When asked if the memoranda indicated that the
term "student-athlete" was invented to stop workers' compensation claims, Byers stated only that
use of the term would allow colleges to better "deal with" such claims. He did note that there was
a tendency "for state agencies or other governmental departments to consider a [g]rant-in-aid
holder playing athletics to be an employee." He went on to say that the student-athlete term was
"put in place to make clear the colleges' intent that the [g]rant-in-aid was not a for-pay contract,
but it was a legitimate . . . scholarship or underwriting a youngster's education." (15)

 Although portions of the evidence provided in Byers's deposition may have some
probative value, the district court could have reasonably determined that its probative value was
substantially outweighed by the danger of unfair prejudice. See Tex. R. Evid. 403. Byers's
testimony could have afforded the jury some information about the NCAA rules and how the term
"student-athlete" came about. However, it is evident that the opinions he espoused throughout
his testimony regarding what he perceived as the NCAA's current thirst for more money and the
reason why in today's world the NCAA should drastically change its rules, are not relevant to
whether Waldrep was an employee of TCU at the time of his injury in 1974. We hold, therefore,
that the district court did not abuse his discretion in determining that Byers's testimony was for
the most part irrelevant and to the extent that it was relevant, the danger of unfair prejudice
substantially outweighed the probative value of the evidence. 

 Even if the district court's decision constituted error, "[t]he exclusion of evidence
ordinarily does not constitute reversible error unless the complaining party can demonstrate that
the whole case turns on the excluded evidence." Porter v. Nemir, 900 S.W.2d 375, 381 (Tex.
App.--Austin 1995, no writ). Byers testified to the same or similar evidence as a witness for
TEIA, Frank Windegger, concerning the background of the NCAA and the money that the NCAA
makes as a result of college athletics. At the time of trial, Windegger was TCU's athletic
director. Moreover, Byers's testimony in some respects supported TEIA's argument that TCU
and Waldrep did not intend for Waldrep to be considered an employee. He confirmed that in
Unsportsmanlike Conduct he expressed "shock" that students receiving grants-in-aid might be
classified as "workers." Both TCU and Waldrep understood that the NCAA rules applied to
Waldrep while he participated at TCU and that those rules were created to make clear that
Waldrep was not being paid to play football. Byers repeatedly stated that the NCAA and its
members wished to make it clear that the grant-in-aid recipient was a student first and a participant
in athletics second. His testimony could be argued to establish that TCU did not intend to employ
Waldrep by having him sign the Letter of Intent and Financial Aid Agreement. We cannot say
that Waldrep's entire case turned on Byers's excluded testimony.

 Waldrep also contends that the district court erred when it excluded Byers's
deposition pursuant to rule 403 because there is no evidence showing that the district court
actually read the deposition. See Tex. R. Evid. 403. Waldrep directs us to Bean v. Baxter
Healthcare Corp., 965 S.W.2d 656 (Tex. App.--Houston [14th Dist.] 1998, no pet.), to support
his argument. However, Bean is factually distinguishable. In Bean, the court of appeals
affirmatively found that the trial court failed to view a videotape. See id. at 659. Here, there is
no evidence that the district court did not read Byers's deposition or view its videotape. We find
that this claim is without merit.

 Waldrep finally asserts that "even if the court did not err in excluding Byers'[s]
testimony and exhibits from Waldrep's case-in-chief, the court erred in excluding the evidence
during rebuttal." Stephen Morgan, who was employed by the NCAA in several positions from
1977 to the time of his testimony, testified by way of deposition for TEIA. Waldrep directs us
to certain points in Morgan's testimony where "[h]e was allowed to testify at length . . . about
the background, history, and construction of the NCAA 'rules,'" and contends that Byers's
testimony contained "completely different information" and should have been admitted to rebut
Morgan's testimony. "[T]estimony which is inadmissible in the first instance may become
relevant and admissible in rebuttal." Johnson v. Hermann Hosp., 659 S.W.2d 124, 126 (Tex.
App.--Houston [14th Dist.] 1983, writ ref'd n.r.e.) (emphasis added). But the alleged rebuttal
evidence must be in fact offered to rebut other evidence, not as a part of the proponent's case-in-chief. See Minor v. Commercial Ins. Co., 557 S.W.2d 608, 610 (Tex. Civ. App.--Texarkana
1977, no writ).

 In his deposition, Morgan first gave a detailed description of the NCAA very
similar to the description given in Byers's deposition. And while Morgan did testify to the
evolution of the NCAA rules, his testimony was limited to the evolution from 1972 through 1974,
the years that Waldrep played football at TCU. Morgan discussed what the "concept" of the term
"student-athlete" referred to at that time, but he did not discuss the reasons why the term
"student-athlete" was created. And finally, Morgan described those portions of the 1972-73
NCAA rules related to its fundamental policy, academic requirements, financial aid awards, and
restrictions on taking pay. 

 For the most part, Morgan's and Byers's testimony related to different topics. 
Morgan's testimony was limited to only those rules and terms that applied while Waldrep attended
TCU. Byers, on the other hand, testified about the rules from their enactment through the time
he wrote his book. Morgan's testimony was limited to the 1972-73 NCAA rules and what they
referred to. Byers, however, never discussed these specific rules; instead, he analyzed the rules
on a much broader scale. To the extent that Morgan and Byers testified about the same topic,
their testimony was strikingly similar. We conclude that Byers's deposition was not offered by
way of rebuttal but as part of Waldrep's case-in-chief. We hold that the district court did not
abuse his discretion by excluding this evidence. We overrule Waldrep's second issue.


NCAA Constitution and Bylaws

 Waldrep next contends that the district court improperly admitted testimony
regarding the NCAA rules on the grounds of relevancy, arguing that these rules cannot preclude
an injured worker from receiving workers' compensation benefits. The sole issue submitted to
the jury addressed whether Waldrep was an employee of TCU at the time of his injury. The
NCAA rules applied to TCU and Waldrep while Waldrep was recruited, signed the Letter of
Intent and Financial Aid Agreement, and participated in TCU's football program. Waldrep
testified that he knew when he signed the Letter of Intent and Financial Aid Agreement that
recruitment and his future involvement in athletics at TCU was governed by the NCAA rules, and
he admitted that he understood the NCAA's fundamental rules. 

 The NCAA rules tend to indicate the terms of Waldrep's agreement with TCU,
including whether Waldrep was an employee at TCU. We conclude therefore that the NCAA
rules were relevant to the jury's determination, and the district court did not abuse his discretion
in admitting the evidence. We overrule Waldrep's third issue.


Medical Expenses

 By his fourth issue, Waldrep challenges, on relevancy grounds, the district court's
excluding evidence that TCU failed to pay Waldrep's medical expenses. The district court
admitted evidence that TCU promised Waldrep's parents that it would "take care" of his medical
expenses if he were injured but excluded evidence that TCU did not pay all of those expenses. 
The district court refused to allow the proffered testimony on the grounds of relevancy:

What is relevant in this case is evidence that shows that Mr. Waldrep was an
employee of TCU. The fact that TCU did pay some expenses is relevant to prove
employment. The fact that TCU might not have paid some of the expenses tends
to show either, one, that he was not an employee -- and that's something that the
defense wants to show -- or that TCU may have breached a contract by not paying
those expenses, and that's not an issue in this case.


So I sustain the objection that -- as to any evidence that TCU did not pay all of the
expenses. And I will allow evidence or stipulation that TCU did pay expenses, but
not evidence that TCU paid only some of the expenses.



 Again, the sole issue in this case is whether Waldrep was an employee of TCU. 
The admission and exclusion of evidence is within the discretion of the trial court. See Alvarado,
897 S.W.2d at 753; Murphy, 868 S.W.2d at 932. The district court admitted the testimony of
Waldrep, Waldrep's parents, Runnells, and Windegger that TCU promised to "take care" of
Waldrep's medical expenses. Such testimony is evidence that might tend to show the existence
of a contract of hire between Waldrep and TCU. The existence of such a contract was the issue
before the jury, not whether any contract between the parties was breached. We cannot say that
the district court acted in an unreasonable and arbitrary manner or without reference to any
guiding principles in making his ruling. See Buller, 806 S.W.2d at 236; Downer, 701 S.W.2d
241-42.

 Waldrep also argues that the district court improperly permitted TEIA to offer
evidence that TCU fulfilled its promise to take care of Waldrep's medical expenses and that this
was a "partial truth" that Waldrep was not allowed to rebut. However, Waldrep does not offer
any argument or authority to support his assertion. Waldrep's brief states only that TEIA
"presented testimony that TCU paid for Waldrep's expenses." We are unable to locate such
testimony in the record, and Waldrep does not direct us to it. See Tex. R. App. P. 38.1(h) (brief
must contain appropriate citations to record). We overrule Waldrep's fourth issue.




Cumulative Effect of District Court's Evidentiary Decisions

 Waldrep finally argues that the district court's "multiple errors regarding the
admission and exclusion of evidence constitute reversible error, even if the errors, taken
separately, were harmless." As we have held that the district court did not abuse his discretion
in admitting or excluding evidence, we find this issue to be without merit. We overrule
Waldrep's fifth issue.


CONCLUSION

 In conclusion, we note that we are aware college athletics has changed dramatically
over the years since Waldrep's injury. Our decision today is based on facts and circumstances
as they existed almost twenty-six years ago. We express no opinion as to whether our decision
would be the same in an analogous situation arising today; therefore, our opinion should not be
read too broadly. Having disposed of all of the issues before us, we affirm the district court's
judgment.



 

 Lee Yeakel, Justice

Before Justices Kidd, Yeakel and Powers*

Affirmed

Filed: June 15, 2000


Publish



* Before John E. Powers, Senior Justice, (retired), Third Court of Appeals, sitting by
assignment. See Tex. Gov't Code Ann. § 74.003(b) (West 1998).
1. Texas Employers Insurance Association ("TEIA") was an association of Texas employers
that insured payment of compensation to employees who sustained injuries in the course of their
employment by TEIA subscribers. A subscriber was an employer who became a member of TEIA
by paying TEIA insurance premiums. See Act of May 12, 1959, 56th Leg., R.S., ch. 355, § 1,
1959 Tex. Gen. Laws 778 (Tex. Rev. Civ. Stat. Ann. art. 8309, § 1, since repealed by Act of
December 11, 1989, 71st Leg., 2d C.S., ch. 1, § 16.01(15), 1989 Tex. Gen. Laws 114). The
district-court pleadings state that Texas Property and Casualty Insurance Guaranty Association is
the statutory successor to TEIA. It is undisputed that at all times relevant to the determination
of the issues before us, TCU was a TEIA subscriber. Because the interests of TEIA and its
successor do not diverge, we will refer to appellee as TEIA.
2. See Tex. Lab. Code Ann. §§ 410.301-.308 (West 1996) (trial limited to issues that were
before Commission); Texas Workers' Compensation Comm'n v. Garcia, 893 S.W.2d 504, 515
(Tex. 1995) (Commission's final decision regarding compensability may be appealed to courts
under modified de novo review limited to issues that were before Commission.).
3. At the time, TCU was a member of the Southwest Conference. That athletic conference no
longer exists.
4. The Letter of Intent provided in pertinent part:


 This is to express my desire to participate in the athletic program at Texas
Christian University and to certify my intention to enroll at that institution on August,
1972. My decision is subject to acceptance by this institution, the fulfillment of its
admission requirements and scholastic requirement for athletic awards.


 . . . .


 Regulations and Procedures for Pre-Enrollment Applications.


 . . . .


 Financial aid is awarded by Southwest Conference members on the basis of a
student-athlete's desire to participate in the athletic program of the institution making
the award. By the signing of the Letter of Intent, the student-athlete pledges that he
will participate to the best of his ability in the athletic program of the signing
institution.


Southwest Athletic Conference, Pre-Enrollment Application (1972).
5. The document warns that Waldrep would not be eligible to play for another Southwest
Conference institution during his freshman year at college and "the first year of varsity
competition for which he would normally be eligible" if he signed with a different school. See
Southwest Athletic Conference, Pre-Enrollment Application (1972). 
6. The Financial Aid Agreement states:


 This is to certify that [Alvis Kent Waldrep] will be awarded financial aid at Texas
Christian University to the extent of room, board, tuition, fees, and $10 per month for
incidentals.


 The above award will be for the period . . . extending from August, 1972, to
May, 1976 inclusive, and will not be canceled during this time except for failure of the
student to comply with the rules and regulations of this institution and of the Southwest
Athletic Conference. This award may be renewed during the period of the student's
athletic eligibility.


 . . . .


 Both my parents . . . and I understand that my failure to meet the scholastic
requirements for athletic awards, or the admission requirements of Texas Christian
University by August 15, 1972 will render this agreement null and void.


Southwest Athletic Conference, Financial Aid Agreement (1972).

7. We note that although Waldrep was injured in 1974, this suit was not filed until 1993, giving
rise to the question of whether the case may be time-barred. TCU did not file a report of
Waldrep's injury with the Industrial Accident Board, the Commission's predecessor (see Act of
December 11, 1989, 71st Leg., 2d C.S., ch. 1, § 17.01, 1989 Tex. Gen. Laws 115), immediately
following the accident. See Tex. Rev. Civ. Stat. Ann. art. 8307, § 7, since repealed by Act of
December 11, 1989, 71st Leg., 2d C.S., ch. 1, § 16.01(10), 1989 Tex. Gen Laws 114. In fact,
TCU did not file a report with the Commission until 1991. When an "employer" has been given
notice or has knowledge of an injury and fails to file a report of the injury, limitations does not
begin to run until the report is filed. See Act of May 26, 1971, 62d Leg., R.S., ch. 993, § 1,
1971 Tex. Gen. Laws 3006, 3006-07 (Tex. Rev. Civ. Stat. Ann. art. 8307, § 7a, since repealed
by Act of December 11, 1989, 71st Leg., 2d C.S., ch. 1, § 16.01(10), 1989 Tex. Gen. Laws
114). 
8. Waldrep does not attack the factual sufficiency of the jury's finding.
9. The sole question submitted to the jury inquired, "At the time of his injury, was Alvis Kent
Waldrep, Jr. an employee of Texas Christian University?" The jury was instructed to answer
"Yes" or "No." 
10. Neither party objected to this definition. It is the definition suggested by Texas Pattern
Jury Charges. See 2 Comm. on Pattern Jury Charges, State Bar of Tex., Texas Pattern Jury
Charges PJC 19.01 (2d ed. 1989) (hereinafter Pattern Jury Charges). The first clause tracks the
language of the Workers' Compensation Act in effect at the time the agreements were signed. See
Tex. Rev. Civ. Stat. Ann. art. 8309, § 1, repealed by Act of December 11, 1989, 71st Leg., 2d
C.S., ch. 1, § 16.01(15), 1989 Tex. Gen. Laws 115. The definition of "employee" for workers'
compensation purposes is currently found in section 401.012 of the Texas Labor Code. See Tex.
Lab. Code Ann. § 401.012 (West Supp. 2000). The current definition does not differ in pertinent
part from that found in the earlier statute. The remainder of the definition, the right to direct the
details of the claimant's work, does not appear in any version of the statute but is derived from
case law primarily contrasting an employee with an independent contractor. See Pattern Jury
Charges, supra, cmt. at 19-3 (citing Turnbough v. United Pac. Ins. Co., 666 S.W.2d 489, 492
(Tex. 1984); Continental Ins. Co. v. Wolford, 526 S.W.2d 539 (Tex. 1975); Anchor Cas. Co. v.
Hartsfeld, 390 S.W.2d 469 (Tex. 1969); Hartford Accident & Indem. Co. v. Hooten, 531 S.W.2d
365 (Tex. Civ. App.--San Antonio 1975, writ ref'd n.r.e.); Allstate Ins. Co. v. Scott, 511 S.W.2d
412 (Tex. Civ. App.--El Paso 1974, writ ref'd n.r.e.); Goodnight v. Zurich Ins. Co., 416 S.W.2d
626 (Tex. Civ. App.--Dallas 1967, writ ref'd n.r.e.)). Although we liberally construe the
Workers' Compensation Act in favor of the employee "to carry out [the Act's] evident purpose,"
Yeldell v. Holiday Hills Retirement & Nursing Ctr., Inc., 701 S.W.2d 243, 245 (Tex. 1985), the
district court properly submitted the case to a jury. Thus, we apply the "no evidence" standard
of review set forth in Sterner v. Marathon Oil Co., 767 S.W.2d 686, 690 (Tex. 1989). See supra
pp. 5-6. 
11. The NCAA rules stated that "[a] student-athlete shall not be eligible for intercollegiate
athletics if . . . [h]e takes or has taken pay, or has accepted the promise of pay, in any form, for
participation in athletics, or . . . has entered into an agreement of any kind to compete in
professional athletics, or to negotiate a professional contract." The National Collegiate Athletic
Association, 1972-73 Manual of the National Collegiate Athletic Association 6 (1972) (the "NCAA
Manual").
12. Waldrep requested the district court to take judicial notice "that at all times relevant to this
case . . . athletics scholarships were excluded from taxable income and were not required to be
reported to the Internal Revenue Service" and directed the court to section 117 of the Internal
Revenue Code. The court responded, "I will take notice of it. I think it's something that at least
I ought to consider. And if you-all want to have some kind of stipulation read or instruction to
the jury, that's fine with me." The record discloses no stipulation or instruction. The Internal
Revenue Code provision in effect at the time Waldrep attended TCU provided, inter alia: "In the
case of an individual, gross income does not include . . . any amount received . . . as a
scholarship at an educational institution . . . or . . . as a fellowship grant, including the value of
contributed services and accommodations . . . ." Internal Revenue Code of 1954, ch. 736, 68A
Stat. 38 (codified as amended at I.R.C. § 117(a) (West Supp. 1999)). This provision does not
eliminate how Waldrep and TCU treated Waldrep's grant-in-aid for tax purposes as an indicia of
employment. Whether a scholarship or fellowship is includable in the recipient's taxable income
is based on the particular circumstances of the grant. See, e.g., Hembree v. U.S., 464 F.2d 1262,
1264 (4th Cir. 1972) ("primary purpose of the payment made to the taxpayer" is controlling);
Burstein v. U.S., 622 F.2d 529, 537 (Ct. Cl. 1980) ("A purpose of section 117 is to avoid the
exclusion of money received as compensation for services but labeled as a 'scholarship' or
'fellowship.'"); Quast v. U.S., 293 F. Supp. 56, 59 (D. Minn. 1968) ("The character of the
payments . . . is determined fundamentally by the usual test of the parties' intent. The question
is did the parties intend a scholarship or a fellowship, or in the alternative a salary."). 
13. Mayo sets forth several factors relevant in establishing employment: (1) the right to hire
and discharge the worker, (2) the carrying of the worker on social security and income tax
withholding records, (3) the providing of equipment, (4) the responsibility to pay wages, and (5)
the right to control the specifics of a worker's performance. See Mayo v. Southern Farm Bureau
Cas. Ins. Co., 688 S.W.2d 241, 243 (Tex. App.--Amarillo 1985, writ ref'd n.r.e.).
14. Having so held, we need not employ the second prong required when reviewing an adverse
jury finding as a matter of law. See supra pp. 5-6; Sterner, 767 S.W.2d at 690. Were we to
consider whether the contrary proposition--that Waldrep was an employee--was established as a
matter of law, our result would be the same. Some, but not all, of the Mayo factors were present
in Waldrep's relationship with TCU. See supra note 12; Mayo, 688 S.W.2d at 243. As some
evidence would support either proposition, Waldrep would fail in his burden.
15. See Rensing v. Indiana State Univ. Bd. of Trustees, 444 N.E.2d 1170,1174 (Ind. 1983).



contractor. See Pattern Jury
Charges, supra, cmt. at 19-3 (citing Turnbough v. United Pac. Ins. Co., 666 S.W.2d 489, 492
(Tex. 1984); Continental Ins. Co. v. Wolford, 526 S.W.2d 539 (Tex. 1975); Anchor Cas. Co. v.
Hartsfeld, 390 S.W.2d 469 (Tex. 1969); Hartford Accident & Indem. Co. v. Hooten, 531 S.W.2d
365 (Tex. Civ. App.--San Antonio 1975, writ ref'd n.r.e.); Allstate Ins. Co. v. Scott, 511 S.W.2d
412 (Tex. Civ. App.--El Paso 1974, writ ref'd n.r.e.); Goodnight v. Zurich Ins. Co., 416 S.W.2d
626 (Tex. Civ. App.--Dallas 1967, writ ref'd n.r.e.)). Although we liberally construe the
Workers' Compensation Act in favor of the employee "to carry out [the Act's] evident purpose,"
Yeldell v. Holiday Hills Retirement & Nursing Ctr., Inc., 701 S.W.2d 243, 245 (Tex. 1985), the
district court properly submitted the case to a jury. Thus, we apply the "no evidence" standard
of review set forth in Sterner v. Marathon Oil Co., 767 S.W.2d 686, 690 (Tex. 1989). See supra
pp. 5-6. 
11. The NCAA rules stated that "[a] student-athlete shall not be eligible for intercollegiate
athletics if . . . [h]e takes or has taken pay, or has accepted the promise of pay, in any form, for
participation in athletics, or . . . has entered into an agreement of any kind to compete in
professional athletics, or to negotiate a professional contract." The National Collegiate Athletic
Association, 1972-73 Manual of the National Collegiate Athletic Association 6 (1972) (the "NCAA
Manual").
12. Waldrep requested the district court to take judicial notice "that at all times relevant to this
case . . . athletics scholarships were excluded from taxable income and were not required to be
reported to the Internal Revenue Service" and directed the court to section 117 of the Internal
Revenue Code. The court responded, "I will take notice of it. I think it's something that at least
I ought to consider. And if you-all want to have some kind of stipulation read or instruction to
the jury, that's fine with me." The record discloses no stipulation or instruction. The Internal
Revenue Code provision in effect at the time Waldrep attended TCU provided, inter alia: "In the
case of an individual, gross income does not include . . . any amount received . . . as a
scholarship at an educational institution . . . or . . . as a fellowship grant, including the value of
contributed services and ac